UNITED STATES of America, Plaintiff–Appellee,

v.

Maurice COOKE, Defendant–Appellant.

No. 96–1852.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1996.

Decided April 9, 1997.

---

Victoria Ursulskis (argued), Office of the United States Attorney, Indianapolis, IN, for Plaintiff-Appellee.

Kirk J. Kavanaugh (argued), Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Defendant-Appellant.

Before CUMMINGS, COFFEY and DIANE P. WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

A jury convicted Maurice Cooke for attempted possession of piperidine with intent to manufacture phencyclidine, 21 U.S.C. §§ 841(d)(1) and 846, as well as using and carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1). In this appeal, Cooke does not challenge his attempted possession conviction; however, he does contend that the evidence was insufficient to support a conviction for using and carrying a firearm in relation to a drug crime and that the "using and carrying" jury instruction given by the district court was erroneous. We reverse Cooke's § 924(c)(1) conviction and remand for a new trial on that charge.

## I. BACKGROUND

While employed as a Youth Manager at the Marion County Juvenile Center in Indianapolis, Larry Whitley met Michael Spicer, who was incarcerated at the Center. Whitley recruited Spicer to burglarize a local chemical company and steal a fifty-five-gallon drum of piperidine, a list I chemical[1] used in the process of manufacturing phencyclidine (known on the streets as PCP or "angel dust")—a Schedule III controlled substance.[2] In February 1995, Spicer succeeded in burglarizing the Riley Chemical company and obtained a drum of piperidine, which he delivered to Whitley. Whitley testified that he transferred the contents of the fifty-five-gallon drum into five-gallon containers and that Cooke flew to Indianapolis from California on two separate occasions to take delivery of the piperidine—taking approximately twenty-five gallons each time. Whitley personally delivered the first installment to Cooke at the

Indianapolis airport; Whitley's son delivered the second installment to Cooke at the airport about a month later. Cooke had previously sent between $8,000 and $9,000 to Whitley by Federal Express as payment in advance.

After both of these deliveries, Cooke contacted Whitley and complained about the quality of the piperidine. Therefore, Whitley again recruited Spicer to burglarize Riley Chemical and instructed him to get regular piperidine this time rather than methyl piperidine. Spicer agreed. However, unbeknownst to Whitley, Spicer had now admitted to the Indianapolis police that he committed the Riley Chemical burglary at Whitley's behest, and was now cooperating with the police in connection with their continued investigation. Working with Spicer, the police arranged to make a controlled delivery of piperidine to Whitley (referred to in the record as a "reverse-sting" operation). In late May 1995, Spicer notified Whitley that he had obtained the piperidine. Whitley, in turn, notified Cooke, who told Whitley that he would get back to him with details regarding when he would arrive in Indianapolis. Cooke subsequently informed Whitley that he would arrive at the Indianapolis airport at 4:00 p.m. on June 1.

Whitley was unable to make the 4:00 o'clock connection with Cooke because he was arrested at his home earlier that day for his attempted possession of piperidine. Whitley now began to cooperate with the police. He informed them that Cooke was in Indianapolis waiting to receive the piperidine. Working with the police, Whitley phoned Cooke at the hotel where he was believed to be staying. Cooke questioned Whitley about why he was not at the airport as planned and informed Whitley that he had spoken earlier to Whitley's wife, who was hysterical and thought that the police were outside. Whitley told a cover story to calm Cooke and arranged to meet with him at the hotel in thirty minutes. Because it took the

---

1. "The term 'list I chemical' means a chemical specified by regulation of the Attorney General as a chemical that is used in manufacturing a controlled substance ... and such term includes ... (J) piperidine and its salts." 21 U.S.C. § 802(34).

2. See 21 U.S.C. § 812(c), Schedule III(b)(7); see also 21 C.F.R. § 1808.12(e)(4).

police considerably longer to pull things to-gether (such as coordinating law-enforcement efforts, wiring Whitley with a sound-record-ing device, obtaining a vehicle for use in the reverse sting, etc.), Whitley was late for this meeting and when he arrived at the hotel Cooke was gone. Accompanied by the police, Whitley drove to the airport where he found Cooke. The police parked an open-bed pick-up truck in the airport parking lot for use in the operation.[3] A five-gallon container os-tensibly filled with piperidine was placed in a cardboard box in the bed of the truck.

Whitley testified that when he found Cooke, the latter was "leery of the whole situation" because of what Whitley's wife had told him on the telephone; however, Whitley reiterated his cover story and assuaged Cooke's reservations. Cooke then rented a vehicle so that he could drive the piperidine back to California. Cooke and Whitley de-cided that they would load up the vehicle either that night or the next morning. Whit-ley informed Cooke that he had a five-gallon can of piperidine in his truck to assure him that it was "the right stuff." Noting that he could not tell anything by looking at it, Cooke declined Whitley's invitation to exam-ine the container. Whitley offered to give Cooke a ride to the rent-a-car parking area so that he could pick up his rented vehicle. When they arrived at the truck, Whitley pointed out the five-gallon container. Cooke asked where the rest of it was and Whitley said he had it stored somewhere. Whitley testified that "we put his bag in the back of the truck, and he got in the one side and I got in the driver's side." At that point, Cooke was arrested and Whitley was taken back into custody. A search of Cooke's lug-gage, a garment bag which was recovered from the bed of the truck, revealed an un-loaded .38 caliber semiautomatic handgun, a fully loaded clip, and a plastic bottle contain-ing thirteen rounds of ammunition. The gun and ammunition were found in a small com-partment inside the garment bag.

Cooke was charged and convicted by a jury of attempted possession of piperidine

with intent to manufacture phencyclidine, 21 U.S.C. §§ 841(d)(1) and 846, as well as using and carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1). He was sentenced to 180 months' imprisonment (120 months on Count 1 and 60 months consecutive on Count 2) and a term of supervised release of three years. On appeal, Cooke contends that the evidence was insufficient to support his conviction on the firearm count and that the district court's jury instructions as to that count were erro-neous.

## II. DISCUSSION

With respect to the firearms count, the district court instructed the jury as follows:

> To sustain the charge of carrying or using a firearm during and in relation to a drug trafficking crime, the government must prove each of the following propositions: (1) that the defendant used or carried a firearm; and (2) that this use or carrying was during and in relation to a drug traf-ficking offense....
>
> In order to demonstrate that the defen-dant carried or used the firearm referred to in Count 2 of the indictment, the gov-ernment is not required to show that a defendant actually carried the firearm on his person during the commission of a controlled substances felony. The phrase "use or carry" is broader than physical possession. It is sufficient if you find that at a given time the defendant had the ability and intent to control the firearm and the circumstances of the case show that the firearm facilitated or had a role in the crime being committed. Having a gun accessible during a drug transaction is suf-ficient to meet the "use or carry" require-ments of 18 U.S.C. § 924(c).
>
> The fact that defendant never had an op-portunity to brandish or discharge a gun does not mean that the gun was not used for purposes of the term "use" in Count 2 of the indictment. It is enough that the firearm facilitated or had a role in the

---

**3.** A truck belonging to a law enforcement officer was used for the reverse sting. The record re-flects that an officer drove the truck to the air-port, where it was then parked in the parking lot with the piperidine placed in the bed of the truck. For ease of exposition, this opinion shall occasionally refer to this truck as "Whitley's truck."

crime such that its presence increased the likelihood of success of the drug offense as a means of protection or intimidation, whether or not a discharge in fact occurred, or if its presence provided the defendant with the security and confidence needed to undertake the alleged drug offense.

Jury Instructions 20, 22, 23.

■ Citing the Supreme Court's decision in *Bailey v. United States,* — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), Cooke contends that the foregoing instructions are erroneous and require reversal of his conviction. In *Bailey,* the Supreme Court held that mere possession of a firearm during a drug trafficking crime does not constitute "use" of the firearm, even if the possession served to facilitate the drug crime by emboldening the defendant's criminal conduct; rather, "use" requires "an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." — U.S. at —, 116 S.Ct. at 505. Although Cooke objected to instruction 22, he did so on grounds other than those asserted here. Accordingly, we review for plain error.[4] *See United States v. Benitez,* 92 F.3d 528, 533 & n. 4 (7th Cir.1996) (reviewing instruction for plain error where defendant offered her own instruction but objected only generally to the given instruction); *United States v. Roth,* 860 F.2d 1382, 1390 (7th Cir.1988) (noting that "[a]n objection that does not point out the problem in the instruction is insufficient because it does not give fair prospect of timely

correction"), certiorari denied, 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661.

■ There can be little doubt that the instructions given in Cooke's trial were plainly erroneous in light of *Bailey,*[5] and the government acknowledges as much. See Appellee's Br. at 10 ("the jury received instructions that were erroneous for a 'use' conviction"). The instructions conflated the terms "use" and "carry," treating them as one and the same. However, *Bailey* makes clear that the meaning of these two terms is not coextensive: "Under the interpretation we enunciate today, a firearm can be used without being carried ... and a firearm can be carried without being used." — U.S. at —, 116 S.Ct. at 507. *See also United States v. Pimentel,* 83 F.3d 55, 59 (2d Cir.1996) (finding similar instructions that conflated "use" and "carry" to be flawed). Moreover, the instructions permitted the jury to return a guilty verdict merely upon a finding that Cooke's possession of the firearm facilitated his offense by giving him a sense of confidence or security. This was plainly erroneous. "Post–*Bailey,* mere possession or placement of a gun to provide a sense of security or otherwise to facilitate a drug offense does not constitute 'use.'" *United States v. Cotton,* 101 F.3d 52, 55 (7th Cir. 1996); *see also United States v. Holmes,* 93 F.3d 289, 292 (7th Cir.1996) ("In this circuit, it is established that a plain error is one that is clear and uncontroverted at the time of appeal.") (internal quotation marks omitted).

■ As is now well established in this Circuit,[6] the fact that an instruction is erroneous under *Bailey* does not necessarily

---

4. Cooke objected to the use of the phrase "it is sufficient if" as used in Instruction 22 and suggested that it be replaced with "You should determine whether," arguing that the former phrase had the effect of lessening the government's burden. Cooke also proposed that the word "is" in the last sentence of Instruction 22 be replaced by "may be" because the word "is" might be understood as a directive whereas "may be" would leave the jurors with the understanding that they were to make a determination. See Transcript at II–96—II–99. Although there is a small degree of overlap between the *Bailey* issues and those raised during defense counsel's colloquy with the judge during the instructions conference, it is apparent that the basis of counsel's objection was not the distinction in meaning

between "use" and "carry" or the proper construction of either of these terms. Hence this issue was not properly preserved for appeal and we review only for plain error.

5. Of course, Judge Barker cannot be faulted for giving these instructions, for *Bailey* had not yet been decided at the time of Cooke's trial and the instructions were generally compatible with circuit precedent. See *United States v. James,* 79 F.3d 553, 553–554 (7th Cir.1996).

6. Although *Bailey* was only decided a little over one year ago, a quick WESTLAW search indicates that this Court has already decided at least thirty appeals raising *Bailey* issues.

mean that a new trial is required. As a panel of this Court recently explained in *Cotton*, our framework for dealing with *Bailey* appeals is as follows:

(1) if all the evidence presented qualifies as either active-employment "use" or "carry," the court will affirm a conviction despite the bad instruction, (2) if none of the evidence presented qualifies as either active-employment "use" or "carry," the court will reverse the conviction outright, and (3) if some of the evidence presented could qualify as either active-employment "use" or as "carry," but other evidence presented points to mere possession or some other type of now-defunct, inactive "use," the court will reverse the conviction and remand for a new trial, since one cannot be sure whether the jury convicted on the proper or improper basis.

*Cotton*, 101 F.3d at 56; *see also United States v. Robinson*, 96 F.3d 246, 250 (7th Cir.1996); *United States v. Holmes*, 93 F.3d 289, 294–295 (7th Cir.1996); *United States v. Gonzalez*, 93 F.3d 311, 320–322 (7th Cir. 1996). Thus the evidence presented at Cooke's trial must be examined to determine into which of these three categories his case falls. Because Cooke raises both a challenge to the validity of the jury instructions and the sufficiency of the evidence, we must review the evidence in the light most favorable to the government and "[w]e shall uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Gonzalez*, 93 F.3d at 319.

The evidence presented at Cooke's trial relating to the firearm was extremely scant and revealed little more than that at the time Cooke was arrested—while sitting in the passenger compartment of the truck—his garment bag, which contained the unloaded handgun and ammunition, was located in the bed of the truck by the container of piperidine. Cooke's counsel elicited the following testimony from Whitley as to how Cooke's bag made it into the back of the truck:

Q. Now, Mr. Cooke had some luggage at that time; right? When he was walking out to the trunk?

A. Yes.

Q. Did you help him with his luggage?

A. Yes, I did.

Q. Did you help him put his luggage in the back of the pickup truck?

A. I think so. I think I did, yes.

Transcript at II–12. Thus there were arguably three evidentiary bases upon which the jury might have rested its guilty verdict as to the § 924(c)(1) charge: (1) Cooke's pistol-containing luggage was placed in the bed of the truck along with the piperidine, and either (2) Cooke carried his luggage to the truck while in the process of consummating the piperidine sale or (3) Cooke accompanied Whitley as the latter carried the bag to the truck.

■ Consistent with the erroneous instructions given in this case, the jury could have determined that the presence of the weapon in Cooke's garment bag—either while it was sitting in the bed of the pickup truck or while being carried (whether by Cooke or Whitley)—constituted "use" of the weapon because it facilitated the transaction by giving him a sense of confidence and security. However, the government now concedes that the evidence cannot support a conviction under the "use" prong of § 924(c)(1) and our independent review yields the same conclusion. *See Gonzalez*, 93 F.3d at 319 (noting that government's concession that defendant's conduct did not constitute "use" of a firearm does not obviate the need for independent review on appeal). Quite simply, there is no evidence in the record that Cooke ever actively employed his weapon in the manner required under Bailey to support a "use" conviction (i.e., brandishing, displaying, bartering or striking with, firing, or attempting to fire). Instead, the record reveals only that an inside compartment of Cooke's luggage contained a handgun and ammunition—a fact that falls far short of active employment.

Accordingly, the inquiry must shift to whether a properly instructed jury could have convicted Cooke under § 924(c)(1)'s "carry" prong. The term "carries" as used in § 924(c)(1) is not one that has yielded to precise definition. Over seven years ago, a panel of this Court observed that "[d]efining

the scope of the statutory term 'carries' ... has not been an easy task for our colleagues in other circuits." *United States v. Edun*, 890 F.2d 983, 988 (7th Cir.1989) (collecting cases). Unfortunately, the passage of time has not brought much clarity to the issue. Compare *United States v. Riascos–Suarez*, 73 F.3d 616, 622–623 (6th Cir.1996) ("We find that in order for a defendant to be convicted of carrying a gun in violation of section 924(c)(1), the firearm must be immediately available for use—on the defendant or within his or her reach."), certiorari denied, ⸺ U.S. ⸺, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996), and *United States v. Baker*, 78 F.3d 1241, 1247 (7th Cir.1996) (agreeing with *Riascos–Suarez* and holding "that a defendant who transports a gun on his person or within his reach, available for immediate use ... may—consistent with *Bailey*—be convicted of carrying a firearm") with *United States v. Miller*, 84 F.3d 1244, 1259–1260 (10th Cir. 1996) (concluding that a gun transported in a vehicle is "carried" even if it is not within easy reach or otherwise immediately accessible), certiorari denied, ⸺ U.S. ⸺, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996).[7] However, we may begin our analysis with a few relatively uncontroversial principles.

■ First, there can be no doubt that a defendant who possesses a weapon on his or her person is carrying the weapon. *See Bailey*, ⸺ U.S. at ⸺, 116 S.Ct. at 507 (using the following as an example of a firearm being carried but not used: "when an offender keeps a gun hidden in his clothing throughout a drug transaction"); *Cotton*, 101 F.3d at 53, 56 (finding evidence that defendant had a gun protruding from his pants pocket when stopped by the police undisputedly showed that defendant was "carrying" a gun); *United States v. Windom*, 82 F.3d 742, 749 (7th Cir.1996) ("a person who has a weapon on his person would ordinarily be said to be carrying a weapon"), rehearing granted on other grounds; *United States v. Booker*, 73 F.3d 706, 709 (7th Cir.1996) (noting that where defendant had conceded that he was carrying a firearm on his person he

fell within the carry prong of § 924(c)); *United States v. Smart*, 98 F.3d 1379, 1393 (D.C.Cir.1996) (affirming § 924(c)(1) conviction despite erroneous use instruction where defendant had gun tucked in his waistband). Furthermore, in *United States v. Baker*, 78 F.3d 1241, 1247 (7th Cir.1996), a panel of this Court rejected the argument that the term "carry" encompasses only those situations in which the defendant possesses a gun on his or her person, stating:

> This definition is far too narrow. Webster's dictionary lists 23 separate definitions of "carry," only the eighth of which is limited to "wear[ing] or hav[ing] on one's person." Merriam–Webster's Collegiate Dictionary 175 (10th ed.1993). We cannot imagine that Congress intended so slim a meaning. Fortunately, we need not consider all 22 other definitions—the first suffices: "to move while supporting: TRANSPORT." *Id.*

78 F.3d at 1247. Accordingly, the *Baker* panel held that "a defendant who transports a gun on his person or within his reach, available for immediate use, during and in relation to a drug trafficking crime may—consistent with *Bailey*—be convicted of carrying a firearm under § 924(c)(1)." *Id. See also United States v. Smith*, 80 F.3d 215, 221 (7th Cir.1996) ("A defendant may be convicted for 'carrying' a firearm even if the firearm was not found on the defendant's person."); *United States v. Barry*, 98 F.3d 373 (8th Cir.1996) (rejecting argument that weapon must be on defendant's person and finding that gun found in glove compartment was carried). In this vein, the First Circuit has found evidence that a defendant carried a briefcase containing a pistol and six pipe-bombs from his car to his garage clearly sufficient to support a conviction under § 924(c)(1)'s "carry" prong. *United States v. Manning*, 79 F.3d 212 (1st Cir.1996), certiorari denied, ⸺ U.S. ⸺, 117 S.Ct. 147, 136 L.Ed.2d 93. As did this Court in *Baker*, the *Manning* court drew on dictionary definitions of the word "carry" (specifically, the court quoted the following definitions from

---

7. Of course, now that the *Bailey* decision has dramatically constricted the range of conduct constituting "use" of a firearm, delineation of the

parameters of the term "carries" takes on heightened significance.

*Webster's Third New International Dictionary* 343 (1986): "to move while supporting (as ... in one's hands or arms)," "to move an appreciable distance without dragging," and "to bring along to another place") and concluded that the defendant's actions readily met all of these definitions. *Id.* at 216. And, in *United States v. Lopez,* 100 F.3d 98 (9th Cir.1996), the Ninth Circuit affirmed a § 924(c)(1) conviction under the "carry" prong, notwithstanding an erroneous "use or carry" instruction, based on evidence that a defendant's purse containing a pistol was found on the front passenger seat of a parked vehicle within reaching distance of the defendant (or a coconspirator). The Ninth Circuit reasoned:

> [T]he jury necessarily found that the firearm in Fuentes' purse on the front passenger seat of Lopez' and Fuentes' truck was "in the defendants' possession or under the defendants' control at the time that a drug trafficking crime was committed as alleged." We conclude that in doing so, the jury also necessarily found that either Lopez or Fuentes transported the firearm "on or about" his or her person such that the firearm was "immediately available for use." The firearm in this case was found in Fuentes' purse on the front passenger seat, within reaching distance of Lopez and Fuentes and less than a foot away from the 270 grams of heroin. Quite simply, no rational jury could have found that the pistol was "in the defendants' possession or under their control" without also necessarily finding that either Lopez or Fuentes "carried" the firearm (in the purse) to the truck.

100 F.3d at 104.

■ It is evident from the foregoing that a properly instructed jury in this case could have convicted Cooke under § 924(c)(1)'s "carry" prong if it found that Cooke personally carried his garment bag, which contained his pistol and ammunition, when he and Whitley walked to the truck at the Indianapolis airport. A jury reasonably could have inferred from this evidence that Cooke transported the weapon in his garment bag while en route to the truck in the process of attempting to possess piperidine. There is no discernible difference between Cooke's act of carrying his luggage containing a pistol and ammunition to the truck in this case and the defendant's act of carrying a purse containing a gun to the truck in Lopez or the defendant's act of carrying a briefcase containing a gun and pipe-bombs to his garage in Manning. We fully concur with our sister circuits, and there can be no serious doubt, that the act of transporting a weapon in any one of these types of hand-held baggage constitutes "carrying" the weapon for purposes of § 924(c)(1). Plainly, in such cases the weapon is "on [the defendant's] person or within his reach, available for immediate use." *Baker,* 78 F.3d at 1247.[8]

If the evidence that Cooke carried his weapon-containing garment bag to Whitley's truck was the only evidence in this case relating to the firearm, the inquiry would be at an end and Cooke's conviction would be affirmed. However, there was other evidence relating to the firearm. Specifically, (1) the jury might have found from the testimony that Whitley, not Cooke, carried the weapon-containing garment bag to the truck, and (2) there was evidence that at the time of his arrest, while he was seated in the passenger compartment of the truck, Cooke's garment bag was located in the bed of the truck in close proximity to the piperidine. It is possible that the jury rested its guilty verdict on one or both of these pieces of evidence. As explained above, such evidence cannot support a conviction under § 924(c)(1)'s "use" prong. We now consider whether it can support a conviction under the "carry" prong.

■ It is readily apparent that if the jury was of the opinion that it was Whitley, not Cooke, who carried the garment bag, then it could not have properly convicted Cooke for "carrying" the weapon since he was not do-

---

**8.** The fact that Cooke's gun and ammunition were contained in a zipped, inner compartment of his garment bag, does not render the weapon unavailable for immediate use. We leave for another day the question of whether a weapon stored in a locked container within a piece of luggage is immediately accessible.

ing the carrying.[9] We may proceed, then, to consider whether the evidence that at the time of his arrest, Cooke's weapon-containing garment bag was laying in the bed of the pickup truck while he was sitting in the passenger compartment, can support a "carrying" conviction, and we conclude that it cannot.

At the time of the arrest the weapon was not being transported at all. In *Baker*, a panel of this Court found that "there is little question that transporting a gun in a car within reasonable reach constitutes 'carrying' for the purposes of § 924(c)(1)." 78 F.3d at 1247. However, the panel cautioned that "the inert presence of a firearm, without more, will not trigger liability under § 924(c)(1). Rather, it is the possession of the firearm coupled with the affirmative act of transporting it during and in relation to a drug trafficking crime that precipitates liability[.]" *Id.* The *Baker* panel's conclusion that movement of the weapon is a necessary requirement for a "carrying" conviction, followed directly from the definition of the term "carry" employed by the panel: "to move while supporting: TRANSPORT." *Id.* (quoting *Merriam–Webster's Collegiate Dictionary* 175 (10th ed.1993)). Thus, although the presence of the gun in Cooke's garment bag in the back of the truck near the piperidine may be some evidence that the gun was possessed "in relation to" a drug trafficking crime, see *Smith v. United States*, 508 U.S. 223, 238, 113 S.Ct. 2050, 2058–2059, 124 L.Ed.2d 138 (1993); *United States v. Molina*, 102 F.3d 928, 932 (7th Cir.1996) (noting "if the drugs are together in the same place it is nearly an inescapable conclusion that they satisfy the in relation to prong of § 924(c)(1)"); *United States v. Jackson*, 65 F.3d 631, 634 (7th Cir.1995), it is not evidence that can support a "carrying" conviction because the truck was never used to transport the weapon. See *Molina*, 102 F.3d at 930–931, 932 (discussing the necessity of physical transportation of the weapon for a "carrying" conviction); *United States v. Moore*, 76 F.3d 111, 113 (6th Cir.1996) (same). Because the pick-up truck used in

this reverse-sting operation was never used to transport Cooke's weapon, its presence in the bed of the truck with the piperidine, standing alone, cannot support a "carrying" conviction. Accordingly, unlike the evidence establishing that Cooke carried his pistol-containing garment bag to the truck while en route to consummate the piperidine sale, this evidence is insufficient to support his conviction.

In light of our conclusion that this evidence cannot support a carrying conviction because the truck never moved the weapon, it is both unnecessary and imprudent to consider a second potential reason why this evidence cannot support such a conviction—namely, the weapon sitting in the bed of the truck was not "carried" by Cooke because it was not immediately accessible to him, while he was sitting in the passenger compartment of the truck. However, because of certain statements contained in this Court's recent *Molina* opinion, a brief discussion of this important issue is warranted.

The circuits are split on the issue of whether a weapon that is aboard a moving vehicle must be immediately accessible to the defendant in order to support a "carrying" conviction under § 924(c)(1). Compare *United States v. Riascos–Suarez*, 73 F.3d 616, 623 (6th Cir.1996) (holding that the "carry" prong was satisfied where the weapon was within reach and immediately available for use), *certiorari denied*, —— U.S. ——, 117 S.Ct. 136, 136 L.Ed.2d 84, *Moore*, 76 F.3d at 113 (clarifying *Riascos–Suarez* and indicating that immediate availability is a necessary condition), *United States v. Pimentel*, 83 F.3d 55, 59–60 (2d Cir.1996) (indicating that immediate accessibility is a necessary requirement, and affirming "carrying" conviction where co-conspirator had immediate access to weapon), *United States v. Giraldo*, 80 F.3d 667, 676–677 (2d Cir.1996) (finding evidence insufficient to support "carrying" conviction of defendant who was sitting in back seat of vehicle and weapon was stored in a cavity under the change dish between the two front seats out of reach of defendant; but finding the

---

9. Because Cooke was charged with neither conspiracy nor aiding and abetting, we need not consider whether, on this view of the facts,

Cooke might properly have been convicted under theories of co-conspirator or accomplice liability for Whitley's act of carrying the weapon.

evidence sufficient to convict defendant who was sitting in front seat within easy reach of the weapon), *certiorari denied*, —— U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83, *United States v. Hernandez*, 80 F.3d 1253, 1258 (9th Cir.1996) (stating, in a non-vehicle case, that "carrying" requires that "the firearm must have been immediately available for use by defendant"), *United States v. Lopez*, 100 F.3d 98 (9th Cir.1996) (same in vehicle context), with *United States v. Miller*, 84 F.3d 1244, 1259 (10th Cir.1996) (explaining that under Tenth Circuit precedent "the government can obtain a conviction under the 'carry prong' even without proof [that] the firearm was in effortless reach" and finding that bags containing weapons located in the rear of a van supported a "carrying" conviction of the driver), *certiorari denied*, —— U.S. ——, 117 S.Ct. 443, 136 L.Ed.2d 339; *United States v. Mitchell*, 104 F.3d 649, 653–654 (4th Cir. 1997) ("the firearm does not cease to be 'carried' simply because it is not readily accessible to the offender"), *United States v. Cleveland*, 106 F.3d 1056, 1066–1068 (1st Cir. 1997) ("the ordinary meaning of the term 'carry' ... affords no basis for imposing an accessibility requirement").

This Circuit has not yet expressly held that such a showing is required. While our *Baker* opinion did agree with the Sixth Circuit and held "that a defendant who transports a gun on his person or within his reach, available for immediate use, during and in relation to a drug trafficking crime may— consistent with *Bailey*—be convicted of carrying a firearm under § 924(c)(1)," immediately after announcing this holding, the *Baker* panel limited it as follows:

> We note, however, one significant limitation to our holding today: *Riascos–Suarez* appears to hold that a defendant may be convicted for carrying a firearm only if the weapon is within the defendant's reach and immediately available for use. While it is certainly true that at some point a defendant's access to a firearm being transported becomes so distant and attenuated that he can no longer be said to be carrying it, we do not decide today how immediate his access must be in order to sustain a conviction under § 924(c)(1). We do not, for example, offer an opinion today on whether

a defendant who has drugs and a fully operable and loaded gun locked in the trunk of his car could be convicted under § 924(c)(1) for carrying a firearm. Rather, we hold simply that at least where a defendant is transporting a weapon within his immediate reach, he may be convicted under § 924(c)(1).

78 F.3d at 1247. Thus *Baker* stands only for the proposition that immediate availability of the firearm (in conjunction with its transportation) is sufficient to support a "carrying" conviction, not that it is necessary. However, in *Molina*, a panel of this Court just addressed the issue left open in *Baker*, stating:

> Although in *Baker* we declined to decide whether the presence of a firearm and drugs in the trunk of a car would be sufficient for a conviction under § 924(c)(1), today we state that it would, noting that a gun does not have to be within a defendant's immediate reach.... If a firearm and drugs are in the same place, and the gun has been moved at all, such as with a car, then both the carrying and relation prong have been established even if both the gun and the drugs are locked together in the trunk of a car.

*Molina*, 102 F.3d at 932. Thus under Molina Cooke's lack of immediate accessibility to his weapon while it was laying in the bed of the pick-up truck would not preclude a finding that he "carried" the weapon. However, as explained above, because the truck never transported the weapon, the evidence that Cooke's garment bag contained a weapon while it was lying in the bed of the truck cannot support a § 924(c)(1) "carrying" conviction and therefore we need not address ourselves here to the issue decided by the *Molina* panel.

Because the Court cannot determine upon which of the three evidentiary bases—one proper, the other two not—the jury rested its conviction in this case, Cooke's § 924(c)(1) conviction must be reversed and remanded for a new trial on that charge.

REVERSED AND REMANDED.

## ADDENDUM

Approximately four months after this case was argued, Cooke sought leave of this Court to file a supplemental brief asserting additional grounds for reversal that were not previously raised or argued. Specifically, Cooke now maintains that his trial counsel, Mr. Steven Riggs, rendered ineffective assistance and that racial bias tainted the selection of his jury. Although Cooke is mindful of this Court's frequent admonishments against bringing ineffective assistance claims on direct appeal, see, e.g., *United States v. Walls*, 80 F.3d 238, 243 (7th Cir.1996) ("We have cautioned repeatedly that appellants should not bring ineffective assistance claims on direct appeal."), and he recognizes that as a general matter his ineffective assistance claims are more appropriately raised in a collateral attack lodged in the district court, see *id.* (" '[O]rdinarily, the appropriate route to raise an ineffective assistance claim is not via a screening in the court of appeals but by motion to the district court under 28 U.S.C. § 2255,' " quoting *United States v. Fischer*, 34 F.3d 566, 568–569 (7th Cir.1994)), he implores this Court to entertain his claims stating, "Appellant maintains that the instant case is most certainly one of those *rare cases* [in which ineffective assistance claims can be fairly resolved on the trial record]. If this Honorable Court will simply review the record, no speculation will be involved, no mind reading will be necessary, and there will be no requirement to second guess the judgment of Appellant's trial counsel, Steven Riggs." Appellant's Br. at 5–6 (citing *United States v. Higdon*, 832 F.2d 312 (5th Cir.1987), *certiorari denied*, 484 U.S. 1075, 108 S.Ct. 1051, 98 L.Ed.2d 1013). This Court's reluctance to consider ineffective assistance claims on direct appeal stems, of course, from the fact that such claims are very unlikely to find any factual support in the trial record and an adverse determination on direct appeal will be res judicata in any subsequent collateral attack. *United States v. Allender*, 62 F.3d 909, 913 (7th Cir.1995), *certiorari denied*, —— U.S. ——, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996). As we have so often put it, "a defendant who presents an ineffective-assistance claim for the first time on direct appeal has little to gain and everything to lose." *Bond v. United States*, 1 F.3d 631, 635 (7th Cir. 1993); *United States v. South*, 28 F.3d 619, 629 (7th Cir.1994); *Allender*, 62 F.3d at 913. Nevertheless, Cooke appears to understand the consequences of his decision to proceed at this time, and consistent with this Circuit's past practice in this area, we shall entertain Cooke's claims notwithstanding their small likelihood of success. *Allender*, 62 F.3d at 913 (" '[W]e do not ordinarily forbid an appellant to present an argument for reversal merely because the probability that the argument will be accepted is low. We are not so paternalistic. If the argument is made and rejected, ... the appellant must live with the consequences,' " quoting *Guinan v. United States*, 6 F.3d 468, 472–473 (7th Cir.1993)).[1]

It is well established under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that to succeed on an ineffective assistance claim, a defendant must establish both that trial counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the outcome of the proceedings. *Id.* at 688, 691–692, 104 S.Ct. at 2064–2065, 2066–2067; *see also Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993); *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997); *Nichols v. United States*, 75 F.3d 1137 (7th Cir.1996). In light of the controlling standards and the fact that "[t]he *Strickland* test is 'highly deferential' to counsel, presuming reasonable judgment and declining to second guess strategic choices," *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir.1997); *see also United States v. Jackson*, 103 F.3d 561, 573 (7th Cir.1996) ("In reviewing a Sixth Amendment ineffective assistance of counsel claim, we presume counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions."); *Galowski v. Berge*, 78 F.3d 1176, 1180 (7th Cir.1996) ("We examine the performance prong of the *Strickland*

---

1. The government—no doubt eager to obtain a favorable ruling and thereby foreclose any possibility of a successful collateral attack raising these issues—has joined in Cooke's request to resolve Cooke's ineffective assistance claims.

test through a highly deferential lens, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.") (internal quotation marks omitted), *certiorari denied,* —— U.S. ——, 117 S.Ct. 202, 136 L.Ed.2d 138, it is readily apparent that the vast majority of Cooke's ineffective assistance arguments (of which there are roughly 15) are too meritless to warrant extended discussion, if any at all.

In particular, after careful review of the record, we find the following 13 bases for Cooke's ineffective assistance claims to be patently without merit: (1) Counsel's waiver of Cooke's right to a speedy trial by twice requesting a continuance to pursue plea negotiations and once not contesting the government's motion for a continuance; (2) Counsel's failure to move for disqualification of the trial judge after she informed counsel that her college-aged daughter had held a summer intern position at Riley Industries (the chemical company from which the piperidine was stolen) earlier in the year during which Cooke's trial was held, but that she did not believe that this circumstance warranted recusal or disqualification under 28 U.S.C. § 144 or 455(a); (3) Counsel's failure to demand a "full scale evidentiary hearing" to determine whether a juror viewed Cooke while handcuffed in the courthouse, and if so, whether Cooke was prejudiced thereby. The trial judge found that the incident posed no problem after she questioned the juror (outside the presence of the other jurors) about it and the juror stated that she "did not pay [any] attention" to Cooke being escorted by the Marshal; (4) Counsel's inquiries to the trial judge regarding her specific procedures for conducting voir dire of the jury and exercising strikes; (5) Counsel's failure to utilize a peremptory challenge to a juror who, on his own initiative, admitted to the Court that, in an effort to avoid jury duty, he had falsely represented on a juror questionnaire that he harbored racial prejudice when, in fact, he did not; (6) Counsel's failure to object to the trial judge's efforts toward conducting an efficient trial and completing it within two days; (7) Counsel's failure—in an effort to save time—to cross-examine Larry Whitley about threatening Michael Spicer in connection with his efforts to get Spicer to return to

Riley Industries and steal more piperidine; (8) Counsel's failure to object to proceeding with closing arguments into the early evening hours after the judge informed counsel that this was the jurors' preference; (9) Counsel's alleged advice to Cooke not to take the witness stand (because his prior criminal conduct might be revealed as might his marriage to a white woman, which could possibly alienate some jurors) even though Riggs recognized it was possible that the jury might believe him; (10) Counsel's failure in closing argument to explicitly ask the jury to return a not guilty verdict; (11) Counsel's alleged advice to Cooke not to speak directly with the probation office in connection with that office's preparation of a presentence report; (12) Counsel's purportedly deficient cross-examination of Whitley (which at one point seems to suggest that Cooke was engaged in illegal activity to support a business venture) and his failure to pursue several lines of evidence, including (i) Counsel's failure to call certain witnesses for purposes of impeaching Whitley, including two witnesses who would testify as to Whitley's drug use; (ii) Counsel's failure to transcribe an audiotape so that the jury could better decipher what was being said; (iii) his failure to call Michael Spicer (one of the government's cooperating individuals) in an effort to elicit testimony concerning to whom Whitley *really* sold the stolen piperidine; (iv) Counsel's failure to call Cooke's nephew to testify "about [Hollywood Dazzlers] videotapes"; and (13) Counsel's failure to present an entrapment defense. With respect to all of these purported bases for Cooke's ineffective assistance claim, we have no hesitation in concluding that Mr. Riggs' advocacy was not objectively unreasonable. The two remaining grounds for Cooke's ineffective assistance claim are intertwined with his Sixth Amendment claim, which is discussed immediately below. Although those two grounds are as unavailing as the others, it is convenient to defer discussion of them until after disposing of the Sixth Amendment claim.

Cooke raises two interrelated arguments concerning the racial make-up of the jury venire and panel. First, he maintains that his Sixth Amendment rights were

violated by the under-representation of African-Americans on the jury venire. Second, he maintains that Riggs rendered ineffective assistance by failing to lodge a standing objection to the racial composition of the venire and panel. As to his first contention, Cooke has completely failed to establish a prima facie case that his Sixth Amendment right to a venire drawn from a fair cross-section of the community was violated. As a panel of this Court explained in *United States v. Ashley*, 54 F.3d 311, 313 (7th Cir.1995), *certiorari denied*, —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 161, such a showing requires the defendant to demonstrate "that the group allegedly excluded is a distinctive part of the community; that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and that this underrepresentation is due to systematic exclusion of the group in the jury selection process." Cooke has failed to provide any facts whatsoever bearing on the second and third elements of this prima facie showing. For instance, he neglects to advise the Court as to the racial make-up of the counties providing jurors for the district court sitting in Indianapolis so that we might determine whether, in fact, African-Americans are significantly under-represented on venires in that district. And, he has made no effort to demonstrate that the apparent under-representation of African-Americans on his particular venire was anything other than a sampling aberration. See *id.* at 314. Finally, Cooke does not even purport to demonstrate that any actual under-representation of African-Americans (assuming it exists) results from systematic exclusion (i.e., exclusion that is "inherent in the particular jury process utilized," *Duren v. Missouri*, 439 U.S. 357, 366, 99 S.Ct. 664, 669, 58 L.Ed.2d 579 (1979)). Indeed, he does not even inform this Court of the district court's method of jury selection. Cooke's "mere observation that there were no African-Americans on a panel that was drawn from a population containing African-Americans simply is not sufficient to demonstrate any systematic exclusion." *United States v. Guy*, 924 F.2d 702, 706 (7th Cir.1991). In sum, Cooke's deficient showing fails to meet his burden of establishing a prima facie showing of a Sixth Amendment violation based on the composition of his jury venire. *See id.; see also Humphrey v. United States*, 896 F.2d 1066, 1071 (7th Cir.1990), *certiorari denied*, 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306.

Although it is not entirely clear, Cooke's supplemental brief suggests that he may also be complaining under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), about the striking of the sole African-American juror in the venire. However, he does not identify who this juror was or who struck the juror. We have painstakingly reviewed the trial transcript and cannot conclude that there was any improper use of peremptory challenges. The prosecution exercised only one of its available peremptory challenges, removing prospective juror Hanna. We cannot discern from the record whether Hanna is Caucasian or African-American. Even granting Cooke the benefit of the doubt on this question, there simply is no basis from which to conclude that the prosecution's use of its peremptory challenge was race-based. To establish a prima facie case of purposeful discrimination under *Batson*, Cooke must do more than merely point to the fact that the government excluded an African-American venireperson by using a peremptory challenge. *United States v. Cooper*, 19 F.3d 1154, 1160 (7th Cir.1994). Cooke "must point to facts and circumstances raising an inference that the potential juror[ ][was] excluded because of race. Otherwise, every peremptory challenge used to exclude any cognizable minority from a petit jury would require a *Batson*-type hearing." *Id.*

As should be evident from the foregoing, Cooke's contention that his trial counsel rendered ineffective assistance by failing to lodge objections on Sixth Amendment grounds to the composition of the venire and petit panel is meritless. Although the presence of only one African-American on the venire might warrant some inquiry into the methods for selecting jurors used by the Indianapolis district court, that fact alone would not be a sufficient basis for raising a Sixth Amendment objection and the record does not suggest that any other bases for

raising such an objection are present in this case. We note in passing that just four years before Cooke's trial, a panel of this Court addressed a Sixth Amendment claim materially identical to Cooke's stemming from a criminal conviction in the Indianapolis District Court. *See United States v. Guy,* 924 F.2d 702 (7th Cir.1991). In *Guy,* as in the present case, the defendant raised a Sixth Amendment challenge based on little more than the fact that there were no African–Americans on his venire. In rejecting that challenge, the *Guy* panel noted that the venire drawn in the case was drawn in accordance with "The Plan for the Random Selection of Grand and Petit Jurors," as authorized by the United States District Court for the Southern District of Indiana, effective November 1, 1985, and amended February 3, 1989. That plan, as well as the plan in effect at the time of Cooke's trial, called for the random selection of potential jurors from a master voter registration list. *See id.* at 705. Citing Circuit precedent, the panel further noted that "voter lists are not an improper source from which to draw a pool of jurors" and "the federal courts that have addressed the constitutionality of voter registration lists unanimously agree that a state may constitutionally draw its jurors from voter lists." *Id.* at 707. Accordingly, the *Guy* panel rejected the appellant's Sixth Amendment claim. The law in this Circuit was no different at the time of Cooke's trial. *See United States v. Ashley,* 54 F.3d 311 (7th Cir.1995) ("We have recently reaffirmed the use of voter registration lists as the source of names for jury venires in this Circuit," citing *Guy*), *certiorari denied,* —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 161. Thus it is clear that the Sixth Amendment objection that Cooke believes Riggs should have lodged would have been futile, and Riggs' performance was not objectively unreasonable by virtue of his failure to raise such a groundless objection. To whatever extent Cooke believes Riggs was ineffective for failing to raise a *Batson* challenge to the prosecution's use of a peremptory challenge, we must disagree. As noted above, Cooke points to nothing in the record which would suggest that the prosecution's use of its peremptory challenge was race-based. Hence there was nothing objectively unreasonable in Riggs' failure to object.

For the foregoing reasons, Cooke's belatedly raised grounds for reversal are without merit.

COFFEY, Circuit Judge, concurring.

I concur in the result reached by the majority, but I write separately because my colleagues' opinions leave the unfortunate impression that the validity of this court's very recent and very clear decision in *United States v. Molina,* 102 F.3d 928 (7th Cir.1996) is somehow in question. It was decided by a unanimous panel of this court, and it has neither been the subject of a petition for rehearing nor, as yet, an application for a writ of certiorari to the United States Supreme Court. *Molina* is the law of this circuit and should be considered binding precedent in cases raising the question of what constitutes "carrying" a weapon "in relation to" a drug trafficking offense. 18 U.S.C. § 924(c).

DIANE P. WOOD, Circuit Judge, concurring.

In light of this court's recent decision in *United States v. Molina,* 102 F.3d 928 (7th Cir.1996), the majority raises the question whether we must decide whether a weapon must be immediately accessible to someone in order to be "carried" for purposes of 18 U.S.C. § 924(c)(1), and concludes that this issue need not be resolved at the present. I agree with that, and I write to point out that resolution of this point was similarly unnecessary to the decision in *Molina,* notwithstanding language in that case purporting to hold definitively that a gun does not need to be within a defendant's immediate reach to qualify under the statute. Taken literally, part of the statement in *Molina* is true and follows from our earlier decisions: something can be immediately accessible even if it is not in the person's hand and he must move in order to reach it. In *United States v. Baker,* 78 F.3d 1241 (7th Cir.1996), for example, we held that a weapon was "carried" when it was located under the defendant's car seat. The defendant plainly would have needed to move in order to put his hands on the gun, but it

was close enough to him that his practical access to it was immediate. *Baker* also reserved for possible future consideration the question whether a loaded gun in the locked trunk of a car would be enough for a § 924(c)(1) conviction.

Neither *Molina* nor Cooke's case presents facts that require us to resolve the question reserved in *Baker*. In *Molina*, as the concluding paragraph of the opinion makes clear, "a rational trier of fact could have found beyond a reasonable doubt that the loaded weapon was within Molina's reach." 102 F.3d at 932. In the present case, depending on the version of the facts the jury accepted, a rational trier of fact could find that Cooke himself carried his luggage to the truck. This would easily satisfy the "carrying" element of § 924(c)(1). Because the truck never moved, I agree that it is not necessary (or even appropriate) to reach the question whether the mere presence of the gun, well away from Cooke's immediate reach, would also satisfy the statute under the broader *Molina* dicta. It would be a considerable expansion of § 924(c)(1)'s "carrying" theory to hold that guns located in locked trunks, or in a suitcase located within the cargo hold of an airplane, were also "carried." We should take the same care in differentiating between "carrying" and mere possession as the Supreme Court required us to do with the analogous distinction between "use" and mere possession in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). When we are presented with a case where the question of immediacy is squarely presented, it will be time enough to decide how direct access must be to satisfy the "carrying" language of § 924(c)(1). On this understanding, I am happy to concur in the court's opinion.