In the

# United States Court of Appeals

## For the Seventh Circuit

No. 03-2964

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WAYNE STEPHENS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 661—**Matthew F. Kennelly**, *Judge.*

ARGUED OCTOBER 28, 2004—DECIDED AUGUST 29, 2005

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Wayne Stephens was employed as a manager in a technical support unit for Accenture's New York office when he repeatedly used an "add to pay" function on his time and expense reports to obtain a total of approximately $67,395 in unauthorized cash advances for personal use. That conduct resulted in his criminal conviction for wire fraud in violation of 18 U.S.C. § 1343.

In his position at Accenture, Stephens was required to use the computer program called Automatic Remote Time and Expense System (ARTES) to file a bi-weekly time and expense report (hereinafter "expense report") that was used in calculating his paycheck. Through ARTES, employees would input information regarding expenses

incurred, and Accenture would use that information to bill the client and to reimburse the employee in the paycheck. Employees could request reimbursement for business-related expenses by filling in the fields labeled "expenses without receipt," "expenses with receipt," and "business meals." In addition, the form included a "add to pay/deduct from pay" line which allowed employees to add to or deduct from their paychecks. The "deduct from pay" line could be used for certain personal expenses, such as charges incurred by employees as a result of personal telephone calls or use of a concierge service that Accenture operated for its employees. The proper use of the "add to" function was at issue in the trial. Some testimony indicated that the "add to" function was to be used only for business-related expenses such as expenses related to international assignments or employee relocations. Stephens, on the other hand, argued that there was no policy related to the use of that function, and that it could be used for personal expenses. Prior to January 2000, Accenture's written Policy 526 stated that "[c]ash advances are not provided via time reports nor through petty cash in the offices." In January 2000, however, that policy was replaced by Policy 63.044, which did not contain that sentence. Policy 526 was in place at the time Stephens was hired, but Policy 63.044 had subsumed it by the time of the criminal actions. Therefore, during the time period of the conduct at issue here, Accenture did not have a written policy regarding the availability of cash advances through the time and expense reports. Accenture's Policy 63.044 did expressly allow the use of corporate credit cards for cash advances or for personal expenses, but further declared that Accenture had no liability for the balance on the accounts and that employees were required to directly pay the entire balance on their monthly statements.

Once an employee completed the expense report, it was sent electronically to Accenture's processing center and its payroll department, where the employee's check was

automatically generated based upon that information and deposited into the employee's bank account. Approximately 5% of the expense reports were audited after they were submitted. In addition, the expense reports contained a field for the name of the employee's supervisor, and a copy of the expense report was automatically sent to that designated supervisor upon submission. The supervisor could also access a supervisee's expense report by using the "auditor's view" of the ARTES program and typing in the supervisee's identification number.

When Stephens was hired in May 1999, his supervisor was Sandra Lieb-Geiger. Lieb-Gieger required Stephens to submit his expense report to her the day before it was due. She would then review it and once approved, would personally submit it to the processing center. While Lieb-Gieger was his supervisor, Stephens often recorded business expenses, but never sought a cash advance using the "add to" function. He also consistently entered Lieb-Gieger's name in the reviewer field. Beginning in March 2000, Neil Penney became Stephens' supervisor. Penney did not preapprove expense reports prior to submission to the processing department. Instead, Penney allowed Stephens to submit the expense reports directly to the processing department, but required Stephens to e-mail a copy to him. Penney testified, however, that he did not check those expense reports and did not notice when his supervisees failed to e-mail copies to him.

In March 2000, shortly after Penney became his supervisor, Stephens submitted his expense report and e-mailed a copy to Penney. Stephens did not request a cash advance through the "add to" function on that expense report. Beginning on April 30, 2000, however, Stephens began utilizing the "add to" function to secure cash advances. His April 30 expense report requested a cash advance in the amount of $7,800. Stephens did not include Penney's name in the reviewer field of that expense report, in-

stead designating himself as his own reviewer, and he did not e-mail a copy to Penney. He also requested reimbursement for business expenses in the amount of $78.00. The government argued at trial that Stephens used the $7,800 figure in the "add to" function because, if confronted, he could argue that it reflected his business expenses of $78.00 and was a mistake in the placement of the decimal point.

Stephens continued that use of the "add to" function for the next six expense reports. On each of six expense reports between April 30 and July 31, 2000, Stephens requested cash advances in amounts between $9,800 and $9,985, increasing his cash advance yield to $67,395. None of those reports were reviewed by Penney because Stephens did not e-mail a copy to Penney and did not include Penney's name in the reviewer field, thus bypassing the automatic sending of the report to Penney.

In his August 15, 2000, expense report, Stephens deviated from his previous pattern of keeping his requests slightly under the $10,000 mark. Instead, he requested a cash advance of $22,980. That request was noticed by Accenture's audit team, and Stephens was fired on August 23, 2000 based on unauthorized cash advances.

Stephens was subsequently convicted of wire fraud and sentenced to 21 months' imprisonment, 2 years supervised release, and $50,000 in restitution. He appeals that conviction, alleging that the evidence was insufficient to support the jury verdict and that the jury selection process violated the Equal Protection Clause.

I

We turn first to Stephens' challenge to the sufficiency of the evidence. In considering this claim, we consider the evidence in the light most favorable to the government,

making all inferences in its favor, and must affirm if a rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. *United States v. Owens*, 301 F.3d 521, 527 (7th Cir. 2002); *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000). In order to convict Stephens of wire fraud under 18 U.S.C. § 1341, the jury had to find that: (1) there was a scheme to defraud; (2) wires were used in furtherance on the scheme; and (3) Stephens participated in the scheme with the intent to defraud. *Owens*, 301 F.3d at 528. Stephens contends that the jury could not rationally find either a scheme to defraud or the intent to defraud. Instead, Stephens contends that the evidence at best establishes simple theft. He argues that the government failed to demonstrate that Accenture's policy expressly prohibited Stephens from making requests for personal cash advances. Furthermore, he asserts that the government failed to establish that he made affirmative misrepresentations or misleading statements when seeking the cash advances or that he engaged in elaborate efforts to conceal his cash requests.

In determining whether conduct evinced a scheme to defraud, the Supreme Court has noted that the words "to defraud" in the mail fraud statute "refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally v. United States*, 483 U.S. 350, 358 (1987), quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *United States v. Lack*, 129 F.3d 403, 406 (7th Cir. 1997); *see also United States v. Wingate*, 128 F.3d 1157, 1162 n.3 (7th Cir. 1997) ("Cases construing the mail fraud statute are equally applicable to the wire fraud statute."). We have previously held that "a necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact." *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003).

We have held that the concept includes both statements that the defendant knows to be false, as well as a "half truth" that the defendant knows to be misleading and which the defendant expects another to act upon to his detriment and the defendant's benefit. *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1346 (7th Cir. 1995). In *Emery*, we further noted that "[a] half truth, or what is usually the same thing a misleading omission, is actionable as fraud . . . if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Id.* at 1348. The mere failure to disclose information will not always constitute fraud, but an omission accompanied by acts of concealment or affirmative misrepresentations can constitute fraud.

The government presented sufficient evidence for a rational jury to find a scheme to defraud. Stephens utilized the cash advance field in his expense report although the money was not sought for any purpose related to work. A jury could find that the request for funds on that expense report carried the implied representation that it was for purposes related to work. Moreover, even if a jury were inclined to believe Stephens that he thought the "add to" line could be used to receive cash advances that he could subsequently repay using the "deduct from" line, a jury could find that Stephens' actions were inconsistent with that use of the "add to" option. The sheer frequency of his requests, along with the increasingly large amounts requested, belie any intention of repaying the funds and are inconsistent with what an employee could reasonably believe an employer would allow. Accenture allowed the use of credit cards for cash advances, but held the employee responsible for clearing the balances on a monthly basis. Given those conditions on the use of the credit card, the contention that Stephens' actions were a proper use of the "add to" function need not be credited. Accordingly, a jury could find that Stephens used that function in a improper

manner to obtain corporate funds for personal use.

Moreover, a jury could find that Stephens engaged in a number of actions to conceal his acquisition of the cash. Accenture maintained a system of supervisor review to ensure that only authorized expenses were allowed. When Lieb-Gieger was Stephens' supervisor, she reviewed his expense reports prior to submission, and Stephens never attempted to seek cash advances using the "add to" function. He also did not do so in his first expense report under his new supervisor, Penney. With his second expense report under Penney's supervision, Stephens did not use the "add to" function, but included his own name rather than Penney's in the reviewer field and did not forward a copy of the report to Penney via e-mail. Only when those actions went unchallenged, indicating that his expense reports were not being monitored, did Stephens proceed to use the "add to" line to acquire cash. Even then, he structured his first request in a manner to avoid suspicion, seeking $7,800 under the "add to" function while seeking $78.00 in payment for proper business expenses. A jury could find that the amounts were calculated to provide him with a plausible explanation if the "add to" request was noticed, in that he could claim that it merely reflected the $78.00 business expenses and he misplaced the decimal point. When that request was successful, Stephens increased the amount of the requests, but kept the amount just under the $10,000 amount that could possibly trigger an audit—another indication that he was attempting to avoid detection.

Stephens nevertheless argues that he made no misrepresentations or misleading omissions, and that his actions therefore constitutes simple thefts at worst. A similar argument was made, unsuccessfully, in *United States v. Lack*, 129 F.3d 403, 406 (7th Cir. 1997), a case which involved mail fraud. Lack was employed as a materials manager by Dairyland Power Cooperative ("Dairyland"),

responsible for the sale of scrap or salvage items on behalf of Dairyland. *Id.* at 404. In that capacity, he devised a scheme to steal money from Dairyland. He accomplished this by opening a checking account in the name of Darrell H. Lack, d/b/a Dairyland Power Conversion, division of Midwest Computer. *Id.* at 404-05. Bank statements were mailed to Lack providing a record of all action on that account. *Id.* at 405. When Lack sold a scrap or salvage item to a buyer, he would deposit the check in that checking account rather than forwarding it to his employer. *Id.* Occasionally, he would forward a check in a smaller amount to his employer Dairyland, with the original purchaser listed as remittur. *Id.* That check would either be delivered or mailed to Dairyland. *Id.* Lack argued that his actions constituted a series of simple thefts rather than a scheme to defraud, because he merely took the funds that were meant for Dairyland, but did not do so by means of deception. *Id.* at 406. We rejected that argument.

We held that the pattern of deceit and the use of false pretenses by Lack constituted a scheme to defraud. *Id.* Essentially, Lack obtained funds meant for one purpose (implicitly at least representing to the buyers that they were paying the proper party for the purchases), converted them to his own personal use, and then engaged in conduct designed to deceive his employer so as to prevent the employer from obtaining knowledge of his improper use of the money. *Id.* That is similar to the scheme in the present case. Stephens obtained funds through the "add to" provision meant to clear an existing personal expense balance that Accenture owed employees. He then converted them to his own personal use even though he knew Accenture did not owe him any money and that his use was unrelated to his employment. In order to evade detection, he misrepresented the name of his reviewer on the form, failed to send the copy to his supervisor as required, and structured his requests and his other expense requests so as to avoid an

audit. That evinces the type of pattern of deceit that properly demonstrates a scheme to defraud.

Stephens also contends that the jury lacked sufficient evidence to find an intent to defraud. The intent requirement targets "a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Owens*, 301 F.3d at 528. Because direct evidence of fraudulent intent is rare, "'specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Id.,* quoting *Paneras*, 222 F.3d at 410. Examination of the scheme in this case provides ample evidence that it was reasonably calculated to deceive. Stephens began his "add to" request only after changing supervisors and ascertaining that his new supervisor was not monitoring the expense reports. He structured his requests so as to avoid detection, beginning with an amount that resembled his proper business expenses so as to provide him with an explanation if it were detected. After that request was successful, he continued the requests, keeping them near, but not over, the $10,000 mark that could plausibly trigger an audit. In each case, he prevented detection by failing to correctly identify his reviewer on the form and by failing to e-mail a copy to his supervisor. Those actions were reasonably calculated to deceive his employer as to the unauthorized cash payments he was receiving. The evidence was sufficient to support the jury verdict here.

## II

Stephens next argues that even if he is not entitled to judgment of acquittal on the sufficiency of the evidence, he nonetheless should receive a new trial because the jury

selection was unconstitutional. Specifically, Stephens contends that the government exercised its peremptory challenges in a discriminatory manner in violation of the Equal Protection Clause.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court reaffirmed the principle that the Equal Protection Clause prohibits a prosecutor from using a peremptory challenge to strike a prospective juror based on race. The Court recognized that the harm inflicted by such an action extends beyond the defendant to the entire community, and undermines public confidence in the fairness of our justice system. *Id.* at 87. Recently, the Supreme Court again catalogued the harms inherent in the discriminatory use of peremptory challenges. The Court noted that the constitutional interests *Batson* sought to vindicate "are not limited to the rights possessed by the defendant on trial, nor to those citizens who desire to participate in the administration of the law, as jurors," but extend to the entire community, undermining public confidence in the fairness of our system of justice. *Johnson v. California*, ___ U.S. ___, 125 S. Ct. 2410, 2418 (2005).

In an effort to identify and to prevent such harmful practices, *Batson* set forth the test for analyzing such claims: first, the defendant must establish a *prima facie* case of racial discrimination by showing facts and circumstances that raise an inference of discrimination, 476 U.S. at 93-94; second, once the *prima facie* case is established, the government must offer a race-neutral explanation for the challenged strike, *id.* at 97; and third, the defendant may then offer additional evidence to demonstrate that the proffered justification was pretextual or to otherwise establish that the peremptory strike was motivated by a discriminatory purpose, *id.* at 98.

A.

The only issue in this appeal is whether Stephens set forth a *prima facie* case of discrimination. That issue comes to us via a circuitous path not typically seen. During jury selection, the *Batson* issue was never raised by the parties. It was in fact flagged in the first instance by the district court after the jury returned the guilty verdict. The court at that time expressed its concerns that the government's peremptory challenges were disproportionately exercised against prospective non-white jurors, a fact that the court had noticed during jury selection but had not addressed because defense counsel had failed to object. Upon reflection, the court regretted its failure to confront the *Batson* issue, determining that it should have required the government to provide explanations for its challenges. The court ultimately concluded that the time for filing a motion for a new trial had elapsed, and therefore that it was without authority to order a new trial. Accordingly, it concluded that it could not address the *Batson* issue, but it informed Stephens of legal avenues still available to pursue the challenge.

Because the issue was not raised at trial by Stephens, the government could have argued before this court that it was forfeited. Of course, the government was well aware that a forfeiture on direct appeal would merely delay consideration of the issue. The district court had already informed the defendant of his right to pursue the *Batson* issue in the context of a post-conviction motion under § 2255. Rather than argue forfeiture and proceed along that path, the government instead informed both Stephens and this court that it would affirmatively waive any forfeiture argument it may have on this issue for purposes of this appeal, and the issue was briefed to this court on the merits.

The dissent protests our consideration of the *Batson* issue now despite the government's waiver, concluding that a first-time consideration at this late stage is particularly unwise. The dissent argues that the deference due a district

court judge has little force when that judge fails to act contemporaneously, and decries the district court judge's consideration of a jury selection matter for which he could provide no remedy.

We note initially that although deference is afforded fact findings in a *Batson* challenge, the *prima facie* determination is subject to *de novo* review. *United States v. Jordan*, 223 F.3d 676, 686 (7th Cir. 2000). Moreover, the record is quite clear that the district judge raised the *Batson* issue in order to provide a remedy, and that the court in fact believed—even at the time of jury selection—that the use of peremptory challenges by the prosecutor raised at least an inference of discrimination under *Batson*. Although the trial court raised the *Batson* issue only after the guilty verdict, the court then revealed that it perceived a *Batson* problem at the time of *voir dire*. At that time, the court did not *sua sponte* raise the issue because defense counsel had not objected. The court later concluded that it had erred in failing to raise *Batson sua sponte*, because the court, not just the defendant, has an interest in a trial process free of discrimination. The court concluded that the *prima facie* case had been met.

Because the court noted the problem at the time of *voir dire*, we have the court's fresh recollection of the manner in which those peremptories were used. The court in fact was so troubled by what it perceived at that time to be a discriminatory use in the *voir dire*, that it raised the issue on its own after the verdict. That commitment by the court to a fair trial process should be commended. Only after the government objected to the court's *Batson* ruling did the district court judge determine that it could not in fact remedy the situation because the time period for filing a motion for a new trial had already elapsed and thus the court lacked the authority to order a new trial. Therefore, the district court judge did not, as the dissent implies, raise

an issue for which it knew it could not provide a remedy. It goes without saying that a defendant risks forfeiting an issue by failing to timely raise it, and that a court should address a *Batson* issue pre-trial. But that gets us nowhere. Although not the preferred route by any measure, this is the situation we must face. The issue was noted but not addressed by the court pre-trial, and the government has affirmatively waived its forfeiture argument on appeal. The issue therefore is properly before us now. It will be no fresher in a post-conviction proceeding.

### B.

The Supreme Court in *Batson* held that in order to establish a *prima facie* case, the defendant must show that he is a member of a cognizable group, that the prosecutor has exercised peremptory challenges to remove venire members of his race, and that the relevant circumstances raise an inference that the prosecutor excluded venire members. *Id.* at 96. That test was expanded in *Powers v. Ohio*, 499 U.S. 400, 402, 415 (1991), in which the Court held that a defendant may object to race-based peremptory challenges whether or not the excluded jurors are the same race as the defendant.

It has further been clarified by Supreme Court recently in *Johnson v. California*, ___ U.S. ___, 125 S. Ct. 2410 (2005). In *Johnson*, the Court considered the showing required to establish a *prima facie* case. The California Supreme Court had held that an objector could not establish a *prima facie* case by presenting merely some evidence permitting the inference of discrimination, but instead must provide strong evidence that makes discriminatory intent more likely than not if the peremptory challenges are not explained. *Id.* at 2415. It therefore held that the *prima facie* showing was not met in that case, where the *Batson* showing consisted primarily of the statistical disparity of peremptory chal-

lenges between African-Americans and others. *Id.* The Supreme Court granted certiorari to determine whether *Batson* permits a court to require, at the *prima facie* stage, that the objector show it is more likely than not that the peremptory challenges, if unexplained, were based on impermissible group bias. The government makes the same argument in this appeal, contending that a *prima facie* case is established only if Stephens presented evidence establishing that discrimination was more likely than not. In *Johnson*, however, the Court held that such a requirement was inappropriate at the *prima facie* stage:

> [I]n describing the burden-shifting framework, we assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated. We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

*Id.* at 2417. The Court further clarified that the first two steps of *Batson* govern the production of evidence which allows the trial court, at the third step, to determine the persuasiveness of the defendant's constitutional claim. *Id.* at 2417-18. An attempt to transport that final persuasiveness inquiry into the *prima facie* stage was therefore improper. *Id.* The California Supreme Court had acknowledged that it certainly appeared suspicious that all three African-American prospective jurors were removed

from the jury by the prosecutor's peremptory challenges. That suspicion constituted an inference that discrimination may have occurred, thus establishing a *prima facie* case under *Batson*. *Id.* at 2419. Therefore, the Court clarified in *Johnson* that the burden at the *prima facie* stage is low, requiring only circumstances raising a suspicion that discrimination occurred, even where those circumstances are insufficient to indicate that it is more likely than not that the challenges were used to discriminate.

Among the circumstances relevant in making that determination, a pattern of strikes against jurors of a particular race may give rise to an inference of discrimination. *Batson*, 476 U.S. at 97.[1] Such a pattern can be evident where a prosecutor uses peremptory challenges to eliminate all, or nearly all, members of a particular race. In determining whether a pattern is present, courts have also considered whether a disproportionate number of peremptory challenges were exercised to exclude members of a particular cognizable group. *Miller-El v. Cockrell*, 537 U.S. 322, 331, 342 (2003); *United States v. Overton*, 295 F.3d 270, 279 (2d Cir. 2002); *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002); *Coulter v. Gilmore*, 155 F.3d 912, 918-19 (7th Cir. 1998).[2] The strikes in Stephens' case

---

[1] The dissent in fact appears to fault us for heeding the mandate of *Batson*, protesting our reliance on the pattern of strikes. *Batson* held that "the trial court should consider all relevant circumstances . . . [f]or example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97. The district court, and this court, properly followed that precedent in considering whether a pattern was apparent.

[2] The dissent asserts that "it is problematic to infer that strikes may be discriminatory simply because peremptory strikes fall disproportionately among members of a certain group," citing

(continued...)

evidence a pattern that gives rise to an inference of discrimination.

After prospective jurors were excused for hardship or cause, the venire consisted of prospective jurors of the following races: 24 Caucasians, 3 African-Americans, 4 Hispanic-Americans, and 1 Asian-American. The government exercised 6 of the 7 peremptory challenges available

---

[2] (...continued)

three cases to support that point. Those cases, however, are inapposite. Two of them did not even address the *prima facie* stage of the *Batson* inquiry, instead discussing the quantum of proof necessary to establish discrimination in the second and third steps. *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 940 (7th Cir. 2001) (*prima facie* case conceded) and *United States v. Roberts*, 163 F.3d 998, 999 (7th Cir. 1998) (*prima facie* case a moot issue). Those cases provide no guidance on whether a pattern of disproportionate use may establish an inference of discrimination. The remaining case, *United States v. Cooke*, 110 F.3d 1288, 1301 (7th Cir. 1997), involved a single peremptory strike of an African-American potential juror, and the defendant provided no context for that strike, failing even to identify who the juror was and who struck the juror. That case never addresses whether a pattern of disproportionate use of peremptory challenges can raise an inference of discrimination. In contrast, the Supreme Court and many circuits have concluded that such a pattern can indeed establish a *prima facie* case of discrimination. *See* cases following note. Although the dissent dismisses *Miller-El* as itself involving the third step of *Batson*, that comparison is invalid. Evidence sufficient to prove discrimination at the third step is necessarily sufficient to establish an inference at the first step of *Batson*. Therefore, *Miller-El* is relevant. The reverse, however, is not true. Evidence may be insufficient to prove discrimination at the third step of *Batson* that would have been enough to demonstrate an inference at the first step. For that reason, the third-step cases cited in the dissent are irrelevant in defining what evidence establishes an inference of discrimination at the first step.

to it. Of those challenges, none were exercised against Caucasian prospective jurors. The government used six peremptory challenges to eliminate 2 African-Americans, 3 Hispanic-Americans, and the sole Asian-American. The defendant excluded the remaining African-American prospective juror, and the jury ultimately was comprised of 11 Caucasians and one Hispanic-American, with two Caucasian alternate jurors.

We consider first the use of two peremptory strikes against African-American venire members. With those challenges the government eliminated 66% of the African-American prospective jurors. Moreover, with those challenges, the prosecutor used 33% of its strikes against African-Americans, who comprised less than 10% of the venire. We are cognizant that with the small numbers involved, a pattern is difficult to detect, and we need not determine whether those strikes alone would demonstrate a *prima facie* case. Instead, we follow the Supreme Court's command to consider "all relevant circumstances" in determining whether an inference of discrimination is met.

One such relevant circumstance is the prosecutor's use of the remaining peremptory challenges. *See, e.g., Fernandez v. Roe*, 286 F.3d 1073, 1079 (9th Cir. 2002) (considering strikes against African-American prospective jurors in context of previous disproportionate strikes against Hispanic-American venire members). In this case, all of the six peremptory challenges were used against members of minority racial groups. Three challenges were used against Hispanic-Americans, eliminating 75% of the Hispanic-Americans on the venire. That also represented a use disproportionate to the representation on the venire, with the government using 50% of its challenges to eliminate members of a racial group that comprised approximately 13% of the venire. Finally, the prosecutor struck the sole Asian-American venire member. Even more compelling, however, is that the prosecutor used no challenges at all

against prospective white jurors, which meant that the government used 0% of its challenges on the group that comprised 75% of the venire at the time the peremptories were exercised. As the Supreme Court has said, "[h]appenstance is unlikely to produce this disparity." *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) (prosecutor's use of 10 of 14 strikes against African-Americans, resulting in only one African-American serving on the jury, was evidence of race-based use of peremptories.) The use of challenges to stack the jury with one race is no more constitutional than the use to eliminate one race.

The dissent complains that—looking only at statistics—Stephens is "lucky" that the government did not initiate a challenge of its own because he struck one-third of the African-Americans (by using one peremptory challenge) and one-quarter of the Hispanic-Americans (again, reflecting only one peremptory challenge). If the dissent is suggesting that discrimination by the government in jury selection would be constitutional as long as the defendant also discriminated against prospective jurors, that would be an astounding proposition. *See Miller-El v. Dretke*, ___ U.S. ___, 125 S. Ct. 2317, 2333 n.14 (2005) (hereinafter *Miller-El II*) (defendant's conduct "flatly irrelevant" to the question of whether the prosecutor's conduct revealed a desire to exclude African-Americans); *Eagle v. Linahan*, 279 F.3d 926 (11th Cir. 2001) (potential *Batson* violation by prosecutor not cured by court's observation that the defendant may have also been using peremptory challenges in a discriminatory manner; *Batson* is meant to vindicate the rights of venire members, not just defendants). It is also an irrelevant proposition here, because Stephens' statistics bear a symmetry to the venire composition that stands in stark contrast to the government's statistics. Stephens used 82% of his challenges (9 in all) against whites who comprised 75% of the venire; he used 9% of his challenges (1 in all) against African-Americans who comprised 9% of the venire;

he used 9% of his challenges (1 in all) against Hispanic-Americans who made up 12.5% of the venire; and he employed 0% of his challenges against Asian-Americans who reflected 3% of the venire. Nothing in that use of peremptories suggests an effort to disproportionately eliminate a particular racial group. In fact, that is as proportionate a use of challenges as one could imagine. In contrast, the government used 0% of its challenges against whites who comprised 75% of the venire; 33% of its challenges against African-Americans who made up 9% of the venire; 50% of its challenges against Hispanic-Americans who comprised only 12.5% of the venire; and 17% of its challenges against Asian-Americans who reflected 3% of the venire. More significantly, that use by the prosecutors eliminated all but one minority venireperson from the jury. Although the *Batson prima facie* inquiry certainly does not demand such close proportionality, the symmetry between Stephens' challenges and the representation of minority venirepersons should at a minimum belie any claim that Stephens is "lucky" that the government did not initiate a *Batson* challenge to his strikes.

The dissent complains that we are simply aggregating small numbers to create a pattern, but the Supreme Court in fact requires us to consider context in evaluating a *Batson* claim. The exclusion of nearly all persons of color from the trial of an African-American defendant looks no less suspicious to the community as a whole because the prosecutor targeted all persons of color rather than solely those of one ethnicity. The suspicions of discrimination are only heightened where no challenges at all are used against prospective white jurors who comprised 75% of the venire.

That inference of discrimination is furthered when considering the context of the strikes as a whole. Although the crime in this case was wire fraud and did not involve issues of race, the defendant was African-American and the witnesses were all Caucasian. Because Stephens' actions

were not contested at trial, the case hinged upon the jury's determination of Stephens' knowledge and intent, issues particularly centering on credibility. Therefore, the nature of the case does nothing to lessen the inference of discrimination raised by the strikes, and in fact furthers it. *See Holloway v. Horn*, 355 F.3d 707, 723 (3d Cir. 2004) (in finding *prima facie* showing, court considered as relevant circumstance that the case largely turned on the credibility of the defendant, who was African-American, and the police officer who took his statement, who was Caucasian). We must respectfully disagree with the dissent's contention that "[t]his is simply not a case in which there is a legitimate concern that racial issues could play a role in jury selection or the outcome of the trial." As Justice Breyer documents at length in his concurrence in *Miller-El II*, "the use of race- and gender-based stereotypes in the jury selection process seems better organized and more systemized than ever before." 125 S. Ct. at 2342; *see generally* 125 S. Ct. 2341-43 and citations therein. Unfortunately, racial stereotyping and unconscious bias is not limited to one particular area of society, and certainly cannot be limited to cases of violent interracial crimes. The evidence of continued racial stereotyping in employment, housing, insurance, and many other areas makes that apparent. Here, the jury had to determine the credibility of an African-American defendant in characterizing his conduct as a white-collar employee, weighed against contrary testimony by Caucasian employees. There is no reason to believe that a jury would be immune to those racial stereotypes in determining credibility or analyzing motives, or that a prosecutor would not see an advantage in an all-white jury in this case.

*Johnson* made clear that "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process . . . . The inherent uncertainty present

in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." [citations omitted] 125 S. Ct. at 2418. Here, the starkly disproportionate use raises suspicions of discrimination that were obvious to the trial judge, and rather than speculate as to reasons for it, as the government would have us do, *Batson* and *Johnson* require that we simply ask the prosecutor for those reasons.

## C.

The government asserts that the pattern of strikes does not in fact yield an inference of discrimination in this case because there are race-neutral reasons for the disparity apparent in the record. We have recognized that courts considering *Batson* claims at the *prima facie* stage may consider apparent reasons for the challenges discernible on the record, regardless of whether those reasons were the actual reasons for the challenge. *Mahaffey v. Page*, 162 F.3d 481, 483 n.1 (7th Cir. 1998). In *Mahaffey*, we provided the hypothetical in which all stricken jurors were attorneys, in which that apparent explanation could negate an inference of race discrimination regardless of whether the attorney status was the actual reason for the strike. *Id.* Actual reasons need not be stated at the *prima facie* stage, but in considering "all relevant circumstances," courts may consider distinctions such as attorney status in determining whether the inference of discrimination is demonstrated. Of course, in the above example, if the prosecutor had failed to strike attorneys who were not members of the cognizable group, the court would consider that as well. *See Henderson v. Briley*, 354 F.3d 907, 908 (7th Cir. 2004) (at *prima facie* stage, comparative evidence between stricken jurors and empaneled jurors is relevant although not required).

This consideration of "apparent reasons" is in fact nothing more than a consideration of "all relevant circumstances" when determining whether an inference of discrimination is established. Our cases provide for it and it normally works to the government's advantage, showing that a seemingly discriminatory pattern of peremptories is readily explained by factors apparent in the record. *Mahaffey*, 162 F.3d at 483 n.1; *see also Johnson v. Campbell*, 92 F.3d 951, 953 (9th Cir. 1996) (in finding no *prima facie* case, court relied on the "obvious neutral reason for the challenge," that the challenged juror had served in a previous trial involving similar allegations of excessive police force and outcome of that trial was unknown); *Capers v. Singletary*, 989 F.2d 442, 446 (11th Cir. 1993) (any inference of discrimination arising from the pattern of strikes against African-American jurors was rebutted by evident, racially neutral justifications for the majority of challenges, including that ten of the African-American potential jurors responded in *voir dire* that they were sympathetic to the defendants' actions and blamed the riots on the failure of the criminal justice system). The use of apparent reasons spares the government the second and third steps of *Batson* in appropriate cases. In other words, the government is under no obligation to point out apparent reasons for strikes at the *prima facie* stage but may do so in an attempt to short-circuit the *Batson* process. Once the government raises apparent reasons, we are obliged to consider them.

After *Johnson* and *Miller-El II*, however, it is clear that this is a very narrow review. The Supreme Court made clear that the persuasiveness of the constitutional challenge is to be determined at the third *Batson* stage, not the first, and has rejected efforts by the courts to supply reasons for the questionable strikes. *See, e.g., Johnson*, 125 S. Ct. at 2414-18 (finding *prima facie* case established even though trial judge's examination of the record convinced him that the prosecutor's strikes could be justified by race-neutral

reasons); *Miller-El II*, 125 S. Ct. at 2332 (noting that a *Batson* inquiry is not a "mere exercise in thinking up any rational basis"). In light of *Johnson*, an inquiry into apparent reasons is relevant only insofar as the strikes are so clearly attributable to that apparent, non-discriminatory reason that there is no longer any suspicion, or inference, of discrimination in those strikes.

Here, the prosecutor argues that the education and work history of the prospective jurors provide apparent race-neutral explanations for the pattern of strikes, with the strikes eliminating the least educated and those with little or no work history in an office setting. The record fails, however, to reveal such an "apparent" basis for the peremptory challenges. The government acknowledges that it accepted five Caucasian jurors who, similar to the stricken jurors, lacked both a college degree and white-collar work experience. Moreover, it further concedes that it struck one Asian-American prospective juror who possessed both a college degree and a white-collar position. The educational and work history, therefore, do not provide "apparent" explanations for the peremptory strikes, because some of those Caucasian jurors not stricken by the government lacked both the college degree and the white-collar work experience. The government has failed to point to any non-discriminatory factor or factors in the record which provide that "apparent" explanation for the prosecutor's strikes.

The government attempts to avoid this by examining each challenge individually, identifying a combination of other factors in the record that led to the challenge, and then explaining why those factors had different impacts in the decision in each individual case. For instance, the government attributes its choices with respect to those prospective jurors to a combination of factors on the record including law enforcement or military experience, criminal history, association with others with law enforcement or military experience or with criminal histories, past litigation

experience, and even the presence of spelling or grammar mistakes on the forms the prospective jurors completed. This identification of numerous unrelated factors, in its specificity and complexity, has all the appearance of a recitation of the government's "actual" reasons for its use of peremptories, but the government has explicitly disavowed that notion, insisting that these are merely reasons "apparent" in the record, and therefore confining us to the *prima facie* portion of the *Batson* inquiry. The weighing of those multiple factors in determining how to exercise the peremptory challenge, however, is not the type of *apparent* explanation that alters the inference of discrimination at the *prima facie* stage because there is no objective basis for us to apply those factors. The government recognized as much, quoting *Pruitt v. McAdory*, 337 F.3d 921, 930-31 (7th Cir. 2003) to emphasize that the selection process could not be narrowed to a single trait or set of traits:

> Picking jurors is a complex and multifaceted process. Individual factors or characteristics often do not provide the 'silver bullet' that will mean acceptance or rejection of any potential juror. Rather, it is the combination of factors that will determine whether a party believes a juror will be favorable to their side.

The weighing process by the government in this case was inherently subjective, turning for each challenge on the government's choice as to which factors were most important in each individual case. The factors identified could as easily have resulted in accepting some minority jurors and striking Caucasian jurors. In fact, a number of prospective jurors with three or four of the "positive" factors were challenged, while Caucasian jurors with similar positives were chosen. The result is that the empaneled jurors shared many of those same characteristics with the eliminated jurors, and no apparent race-neutral pattern is discernible. An apparent explanation for challenges must be just that—apparent—in that the court can readily attribute the

challenges to that discernible, consistent explanation (as with the attorney example discussed earlier). The subjective weighing of factors offered by the government is not such an "apparent" explanation, and has no place in the *prima facie* determination.

That is not to imply that the government in fact lacked legitimate non-discriminatory reasons for the choices it made. Instead, the only question before us is whether the government should be required to articulate its actual reasons for the peremptory challenges. The district court would then determine whether the government's explanation for its challenges is credible. The government's detailed recitation of multiple factors and its weighing of those for each individual prospective juror is more appropriate at the next stages of review. And the government's contention that the defendant at the *prima facie* stage must establish that discrimination is more likely than not has been squarely rejected in *Johnson*. Consistent with *Johnson*, we would not involve the court in an extensive inquiry at the *prima facie* stage. Instead, if the strikes raised an inference of discriminatory use, then we would not have the court engage in "needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Johnson*, 125 S. Ct. at 2418. The *prima facie* showing in this case did not stem from the exercise of a single peremptory challenge against a member of a cognizable group. Instead, it was the result of a pattern of challenges that were exercised in a grossly disproportionate manner against members of cognizable racial groups, which was rendered more questionable by the context in which: no peremptory challenges were exercised against potential Caucasians jurors who comprised 75% of the venire; the defendant was African-American and all of the witnesses were Caucasian; the case turned on the jury's assessment of the defendant's credibility and motives; and there was no apparent explanation in the record that would attribute the

challenges to a non-discriminatory basis. Moreover, our opinion explicitly rejects the government's attempt to transport the detailed weighing process from the second and third steps of *Batson* to the *prima facie* analysis. We make it clear that the examination of "apparent" reasons in the record for peremptory challenges involves only reasons for the challenges that are objectively evident in the record, and does not enmesh the court in an examination of the government's detailed recitation of multiple factors. This approach, rather than that of the dissent, would ensure that the *prima facie* stage remains a straightforward, preliminary showing of an inference that *Batson* and *Johnson* requires, not the establishment of ultimate discrimination that is reserved for the third step.

This case is REMANDED for further proceedings consistent with this opinion. If the district court ultimately concludes that no equal protection violation occurred in jury selection, then it should reconsider its sentencing in light of *United States v. Booker*, ___ U.S. ___, 125 S. Ct. 738 (Jan. 12, 2005).

KANNE, *Circuit Judge*, concurring in part and dissenting in part. I concur with the majority's cogent analysis and conclusion respecting Stephens's challenge to the sufficiency of the evidence contained in Part I.

I must, however, part ways with the majority in its treatment of Stephens's *Batson* claim in Part II. It is unwise

to consider Stephens's *Batson* claim in the first instance when he failed to preserve the issue by objection during jury selection, and the district court did not raise the issue until long after it could have fashioned any relief. Even on the merits, however, I do not believe that Stephens has established a *prima facie Batson* claim warranting a remand. Moreover, the majority's analysis muddles the three-part framework and the allocation of the burden of persuasion as set forth in the *Batson* line of cases.

At the outset, it bears repeating that this case comes to us in an unusual posture, in which Stephens's *Batson* challenge was considered in the first instance at the appellate stage rather than at the district court level. At trial, the parties conducted jury selection—including the government's peremptory strikes at issue here—without a whiff of complaint or objection on the part of Stephens's counsel or, for that matter, the district court itself.

The only reason Stephens's *Batson* claim is before us and not forfeited is the government's agreement to waive any forfeiture argument for purposes of this appeal, so long as Stephens brought the *Batson* challenge on appeal rather than as a collateral attack under 28 U.S.C. § 2255. The rationale, we learn, is the government's hope that we clarify something that should by now be perfectly obvious—under the *Batson* framework, a defendant has a meaningful burden to establish a *prima facie* case of discrimination before a court may require explanation from the government. This burden is not to be taken for granted or ignored. *See United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995); *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994).

Even though the government acquiesced to Stephens's

belated *Batson* challenge,[1] I believe that a first-time consideration of his claim at this late stage is particularly unwise. The majority and I agree that one of the reasons we deferentially review district judges' factual determinations with regard to *Batson* is the fact that they "sit[ ] in the unique position to make credibility assessments of the actions of trial attorneys . . . [and] ha[ve] the opportunity to observe patterns and practices of particular attorneys during prior jury selections." *United States v. Cooper*, 19 F.3d 1154, 1161-62 (7th Cir. 1994); *accord Bergodere*, 40 F.3d at 517. This deference is in part due to judicial recognition that jury selection is a nuanced process "that is not an exact science. Its watchwords are judgment, flexibility, and discretion." *Bergodere*, 40 F.3d at 517; *see also Dunham v. Frank's Nursery & Crafts, Inc.*, 967 F.2d 1121, 1126 (7th Cir. 1992). Therefore, it is axiomatic that trial judges are normally in the best position to observe jury selection and resolve *Batson* challenges *in the first instance and in the*

---

[1] Naturally, the government understood that Stephens *could* have brought a *Batson* challenge by collateral attack rather than on direct appeal. At argument, the government expressed its concern that trial courts, when resolving *Batson* challenges, often rubber-stamp defendants' *prima facie* burden and move prematurely to the second and third stages, thus making it the government's burden to offer its actual reasons every time it strikes minority venirepersons. The government wanted Stephens's case to be heard on the merits in order to clarify a *Batson* challenger's burden at the prima facie stage, see discussion *infra*. The government certainly could have made a compelling argument that Stephens forfeited his *Batson* claim by not raising it in a timely fashion in the district court. *See, e.g.*, *McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996) (reversing grant of habeas writ, holding that "the failure to object to an adversary's use of peremptory challenges until after the completion of jury selection waives the right to do so").

*appropriate time frame.* It is at this point that the majority and I must part ways. The reasons for deference have little force when the district court fails to act contemporaneously in response to an objection or even its own perception of possible discrimination during jury selection. *See United States v. Chandler*, 12 F.3d 1427, 1431 (7th Cir. 1994) ("Contemporaneous objection is imperative with respect to *Batson* claims because the trial court frequently is in a position to rule on the objection, and in all probability[,] to resolve such claims. . . .").

The jury's verdict in the case was returned on February 21, 2003. Then, over two months after completion of the trial, the district judge *sua sponte* raised the *Batson* issue. It is baffling that the district judge brought up a jury selection matter for which he no longer could provide a remedy. Moreover, it seems a distinctly bad idea for us to compound the problem by taking up where the district judge left off. Stephens's counsel never made a timely objection during jury selection (or at any time, for that matter), nor did he speak up when the district court asked whether either side had any concerns following the peremptory strikes and before empaneling the jury. *Cf. Aki-Khuam v. Davis*, 339 F.3d 521, 527 (7th Cir. 2003); *United States v. Brisk*, 171 F.3d 514, 523 (7th Cir. 1999); *Holder v. Welborn*, 60 F.3d 383, 388 (7th Cir. 1995); *Doe v. Burnham*, 6 F.3d 476, 481 (7th Cir. 1993).

The majority aptly describes Stephens's *Batson* claim as coming before us "via a circuitous path not typically seen." And with good reason—abundant caselaw instructs that a party failing to make a timely *Batson* objection forfeits the right to do so on appeal. *See, e.g.*, *Chandler*, 12 F.3d at 1431-32; *accord Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 561-62 (5th Cir. 2001); *McCrory*, 82 F.3d at 1249. This is a sensible rule for any number of reasons, including judicial economy and fairness. *See Ford v. Georgia*, 498 U.S. 411, 422 (1991); *McCrory*, 82 F.3d at 1247 ("If . . . a

*Batson* objection may be raised after the jury has been sworn and trial has begun, there can be no remedy short of aborting the trial. This would permit the defendant to manipulate the system to the extreme prejudice of the prosecution and give the defendant a strong inducement to delay raising the objection until trial is underway."). In addition, the opportunity to vindicate the rights of an excluded venireperson will be lost if an error is not corrected prior to empaneling the jury. *See Galarza v. Keane*, 252 F.3d 630, 642-43 (2d Cir. 2001) (Walker, C.J., dissenting). These considerations do not disappear simply because the government affirmatively relinquished its forfeiture arguments, nor should the district court's post-trial ruminations about possible discrimination—at a point when its ability to do something about the strikes had long since expired—weigh in favor of our hearing Stephens's *Batson* challenge in the first instance.

This is not to imply that the district court's belated order was on a par with a defendant's tardy *Batson* objection brought after a guilty verdict. The district judge indeed was in a position to evaluate the government's peremptory strikes (as was Stephens's counsel) and to take action in a timely fashion. It is an open question whether a trial court must *sua sponte* raise a *Batson* issue at the first sign that something may be amiss. *See Burnham*, 6 F.3d at 481 ("We are aware of no case which authorizes a judge to invoke *Batson* when a party has never objected on that basis."); *accord Clark v. Newport News Shipbuilding & Dry Dock Co.*, 937 F.2d 934, 939 (4th Cir. 1991) ("Neither *Batson* nor its progeny suggests that it is the duty of the court to act *sua sponte* to prevent discriminatory exclusion of jurors. Rather, even in criminal cases, the objection is deemed waived if not timely raised."). But even if there is such an obligation, a court's intervention should be timely, just as courts require of *Batson* objections from parties. Putting off action on potential *Batson* problems ill serves the parties

and excluded venirepersons, and also increases costs to the judicial system. *See Brisk*, 171 F.3d at 523 ("When a new trial must be granted because of an untimely *Batson* decision, the error imposes an additional and unnecessary expenditure of judicial and litigant resources since a new trial could have been avoided by a timely decision.") (citation and internal quotation marks omitted).

Finally, the nuanced nature of voir dire itself demands prompt resolution of potential *Batson* problems. *See McCrory*, 82 F.3d at 1248. Delay increases the risk that the lawyers involved in jury selection will not be available or will not adequately recall details of voir dire and the actual reasons for striking particular venirepersons. *See Holder*, 60 F.3d at 388. Indeed, I note that in the government's motion to vacate the district court's post-trial *Batson* ruling, filed less than four months after voir dire, the government represented that its prosecutors could not reliably recall details of the racial composition of the venire. (R. 39 at 16.) Assuming these same prosecutors are available to appear at a *Batson* hearing on remand, it is unlikely that their memories have improved in the years since jury selection in this case. *Cf. Carter v. Hopkins*, 151 F.3d 872, 875 (8th Cir. 1998).

These prudential concerns aside, a review of Stephens's belated challenge on the merits must comport with the well-established *Batson* framework. In the first stage of this three-part framework, a defendant seeking to establish a *prima facie* case "must point to facts and circumstances raising an inference that the potential jurors were excluded because of race." *Cooper*, 19 F.3d at 1159. Only after the defendant makes out a *prima facie* case do matters proceed to the second stage, in which the government must offer race-neutral actual reasons for its challenges, *see McCain v. Gramley*, 96 F.3d 288, 290 (7th Cir. 1996), and the final stage, in which the trial court decides whether the government's proffered reasons are pretextual, indicating that race

discrimination is afoot. *See United States v. Alanis*, 265 F.3d 576, 584 (7th Cir. 2001). At all times during this analysis, the burden of persuasion rests with, and never shifts from, the opponent of the peremptory strike. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam); *United States v. George*, 363 F.3d 666, 673 (7th Cir. 2004).

Despite the government's hopes, the majority's analysis does nothing to clarify the *prima facie* burden of a defendant making a *Batson* challenge. The majority instead finds a pattern of racially disproportionate strikes by the government despite the small numbers involved and then effectively places the burden on the government to rebut the inference of discrimination, even though it is Stephens who must carry the burden at this stage. Under the majority's analysis, the statistically disproportionate strikes alone apparently are enough to satisfy that burden, so the challenging party really does not need to come forward with any evidence at all. Thus, a party must explain its actions any time it strikes a minority venireperson in a manner disproportionate to the racial makeup of the venire, no matter that the numbers of minorities on the venire are so small that even a single strike may be facially disproportionate.

In this case, the government used 33% of its strikes (2 out of 7) against African-Americans, who represented 9.7% of the venire (3 out of 31, following strikes for cause). According to the majority, the inference of discrimination arises from this disproportionate use of peremptory challenges against African-Americans, and statistical evidence of the government's strikes against the other minorities constitute additional "relevant circumstances" supporting an inference of discrimination. But we have expressed doubt that statistical evidence alone rises to the level of establishing a *prima facie* case. *See McCain*, 96 F.3d at 291 ("[I]t is illogical to infer in every case a discriminatory intent from noting that the percentage of challenges used by one party

against members of a racial group is either more or less than the percentage of that group's total percentage of the venire panel."); *accord Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004) (en banc) ("Though statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply.").

Rather than looking to circumstances that actually might be relevant, the majority simply looks to more raw numbers—the government's strikes against Hispanics and the sole Asian venireperson—and concludes that the pattern of discrimination is established. It is, however, problematic to infer that strikes may be discriminatory simply because peremptory strikes fall disproportionately among members of a certain group. *See United States v. Roberts*, 163 F.3d 998, 999 (7th Cir. 1998) ("*Batson* establishes a rule of disparate treatment, not of disparate impact. . . ."); *United States v. Cooke*, 110 F.3d 1288, 1301 (7th Cir. 1997) ("[The defendant] must do more than merely point to the fact that the government excluded an African-American venireperson . . . ."); *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 941 (7th Cir. 2001) ("[T]he exclusion of all members of a specific minority group does not, on its own, establish that the peremptory strikes were discriminatory.").[2] An appar-

---

[2] My colleagues dismiss these cases as inapposite with regard to the *prima facie* stage. I cite these cases, however, for the broad point that racially disproportionate strikes alone will not suffice to show that peremptory strikes are discriminatory, whether at the *prima facie* stage or beyond. But if these cases are inapposite for not addressing the quantum of proof required at the *prima facia* stage, so is *Miller-El* (cited by the majority), which itself concerned the third stage of the *Batson* framework. *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). More relevant, the other case I cite, *McCain*, was decided by this court, directly addresses the

(continued...)

ently dispropor-tionate pattern of strikes may have relevance, but even so, the existence of such a pattern alone does not end the inquiry. *See McCain*, 96 F.3d at 292.

A "pattern" is more appropriately understood from a party's actions and the way in which it conducts peremptory strikes, as opposed to raw numbers alone. *See id.* at 291-92 ("[A] 'pattern' does not *necessarily* correlate to the racial proportions of the venire panel. . . . A 'pattern' is more likely demonstrated by the manner in which a party uses its strikes as compared to its total strikes or to the total number of members of the racial group.") (emphasis in original). Thus, "even if a 'pattern' could be said to exist, that fact is not dispositive. Courts must look to the totality of the circumstances, including the final make-up of the jury and the questions asked by the party." *Id.* (citing *Batson* and *Splunge v. Clark*, 960 F.2d 705, 707 (7th Cir. 1992) (finding relevant that the prosecutor demanded certain responses only from African-American venirepersons)); *accord Bergodere*, 40 F.3d at 516 ("A defendant who advances a *Batson* argument ordinarily should come forward with facts, not just numbers alone.") (citation and internal quotes omitted).

The totality of the circumstances present in this case reveals that there is no *prima facie* evidence of race discrimination. The district judge alone conducted voir dire, so there could not have been discriminatory questioning by the

---

[2] (...continued)

*prima facie* question, and expresses this circuit's skepticism that numbers alone will satisfy the *prima facie* stage. In contrast, the majority cites cases from the Second and Ninth Circuits, which, unlike this court, have expressly adopted the position that statistical disparity *alone* may satisfy the burden at the *prima facie* stage. *Cf. Brewer v. Marshall*, 119 F.3d 993, 1004-05 (1st Cir. 1997) (contrasting Second and Ninth Circuit views on statistical evidence with *McCain*'s reservations regarding same).

prosecutors, and there is nothing in the record to indicate any discriminatory behavior or statements on the prosecutors' part. The only hint of discrimination to be found comes from racial statistics, and these are inadequate to carry Stephens's *prima facie* burden.

A closer look at the parties' use of peremptory strikes reveals why it would be inappropriate to conclude that "numbers alone" can constitute a pattern satisfying the *prima facie* burden. Because the number of minority venirepersons was so small, the magnitude of the statistically disproportionate strikes against minorities was exaggerated to such an extent that it would have been impossible for the government to strike any minorities without creating an inference of discrimination under the majority's expansive formulation. For example, even if the government had used all 7 of its strikes, and eliminated even one African-American, 14.2% of its strikes would have eliminated a minority representing only 9.7% of the venire. The effect is even more pronounced if (as happened here) the government strikes the lone member of a particular minority group—in this case, the government used one of its six strikes to remove the sole Asian-American venireperson (thus using 17% of its challenges to eliminate 3% of the venire).

The majority simply aggregates the statistically disproportionate strikes against members of several minority groups to find a "pattern," and the majority's view makes no allowance for the exaggerated effect due to small numbers. True, our caselaw does not suggest a numerical cutoff for when a disproportionate pattern of strikes by itself may become statistically significant and properly support an inference of discrimination. But surely this court's demonstrated reluctance to rely on numbers alone (and our requirement that a *Batson* challenger point to additional "facts and circumstances") is at least partly a response to making too much of statistics when the numbers involved

are so small. *Cf. Cooke*, 110 F.3d at 1301; *McCain*, 96 F.3d at 291-92.

Instead of looking to numbers alone, the better approach is to look at the manner of the strikes, and other facts that indicate whether a party acted with discriminatory purpose, in order to put statistics into a useful context. *See McCain*, 96 F.3d at 291-92. In this case, for example, the majority focuses solely on the raw numbers of the government's peremptory strikes, but does not address the inferences to be drawn by the strikes the government did not make. It must be relevant, for example, that the government did not exercise all of its peremptory challenges, although minorities remained in the venire and eligible for jury service. *Cf. United States v. Griffin*, 194 F.3d 808, 826 (7th Cir. 1999) ("[T]he fact that the [g]overnment did not challenge the other black juror further weakens the argument that the government's strikes were based on a motive to discriminate.") (citation and internal quotes omitted). Specifically, the government did not use its remaining peremptory challenge to remove Juror #4, a Hispanic woman who was seated as a juror, or Juror #13, an African-American woman. Indeed, with regard to these jurors, the prosecutors' acquiescence to their service is consistent with the "apparent" reasons for its peremptory strikes, as discussed *infra*.

But even if numbers alone can trigger an inference of discrimination, Stephens is lucky that the government did not initiate a *Batson* challenge of its own. Stephens himself struck from the venire one African-American (Juror #13), one Hispanic, and nine Caucasians. Looking only at statistics, as the majority does, one could arguably infer discrimination on *Stephens*'s part—after all, he complains on appeal that no African-Americans and only one Hispanic remained on the petit jury, yet he struck one third of the African-Americans and one quarter of the Hispanic venirepersons himself.

The majority questions this observation and infers that I suggest that the government's actions are immune from scrutiny because Stephens himself struck minority venirepersons. I certainly wish to dispel any illusion that I subscribe to the latter proposition. I have called attention to Stephens's strikes not to suggest that they cancel out possible wrongdoing on the government's part, but instead, to further illustrate the problem of inferring discriminatory intent from statistics alone. We have said that one relevant factor to consider in the totality of the circumstances is the final makeup of the jury, *e.g.*, *McCain*, 96 F.3d at 292, and it is indisputable that Stephens himself has helped to bring about a jury with no African-Americans and one fewer Hispanic. *Cf. Mahaffey v. Page*, 162 F.3d 481, 484-85 (7th Cir. 1998) (noting that the most important factor in the case was that the jury did not include any African-Americans, and thus "not a single member of Mahaffey's own race was seated on the jury that decided his fate").

Nevertheless, the majority instead praises Stephens's strikes because they bear a symmetry to the racial composition of the venire and concludes that nothing about Stephens's strikes suggests an effort to disproportionately eliminate a particular racial group. Racial proportionality is not, however, the standard by which we are to assess whether a party's peremptory strikes run afoul of *Batson*. If that is what the majority proposes (that racially proportionate strikes are necessarily immune from *Batson* scrutiny), it is the majority that has endorsed an astounding proposition. There is no principle requiring racially proportional strikes. *E.g.*, *Batson*, 476 U.S. at 86 n.6; *McCain*, 96 F.3d at 291. And individuals, not racial groups, have the right to serve on juries. *Cf. Powers v. Ohio*, 499 U.S. 400, 409-10 (1991). Indeed, if a party purposely set out to empanel a jury directly proportional to the racial makeup of the venire, it very likely would be forced to discriminate

against some venirepersons on the basis of race in order to achieve that balance. No matter how noble its intentions, such a strategy would offend *Batson* just as surely as one that struck jurors on the basis of discriminatory stereo-types. *Cf. United States v. Nelson*, 277 F.3d 164, 209-12 (2d Cir. 2002) (concluding that racial or religious "jurymandering," whether by the parties or by the trial court, is impermissible).

Having found a *prima facie* case on the numbers alone, the majority looks to other factors present in this case and concludes that none of them changes its conclusion. For example, the majority concludes that because Stephens is African-American, and the trial witnesses Caucasian, a circumstance arises that "does nothing to lessen the inference of discrimination." To me, this puts the cart before the horse, because it suggests that the government must, at the *prima facie* stage, present evidence to contradict the majority's conclusion that Stephens has met his burden.

In any event, the fact that the prosecution's witnesses were all Caucasian does not present a racially sensitive situation whereby peremptory challenges against African American jurors (let alone jurors of other minority races) are to be viewed with even greater scrutiny. Moreover, the underlying facts and subject matter of the case are not racially charged and do not suggest that strikes against minority venirepersons might weigh in favor of finding an inference of discrimination. This case is therefore quite unlike those cases in which race had special signifi-cance—for example, the racially inflammatory situation presented in *Mahaffey*, in which an African-American defendant from Chicago's south side was prosecuted for horrific crimes committed against a Caucasian family who lived in a north side neighborhood. *See Mahaffey*, 162 F.3d at 485; *accord Stewart*, 65 F.3d at 925.

In the present case, Stephens, who attended Yale, was

holding down a white-collar management position at Accenture and was accused of using a computer function to defraud his employer of over $60,000 in unauthorized cash advances. Nothing about the crime alleged raises the specter of racial inflammation, and the fact that the prosecution's witnesses all happened to be Caucasian does not change this conclusion. *Cf. United States v. Grandison*, 885 F.2d 143, 149 (4th Cir. 1989) ("[T]o infer prosecutorial discrimination because of the race of government witnesses has serious implications. . . . [A]ny party is forced to take its witnesses as it finds them."). This is simply not a case in which there is legitimate concern that racial issues could play a role in jury selection or the outcome of the trial.

The majority also finds additional support for Stephens's *prima facie* case by engaging in a detailed parsing of what the government offers as "apparent" race-neutral reasons for its strikes (reasons that the government apparently felt compelled to offer in order to rebut the presumption of discrimination). In this regard, it is worth noting that Stephens, the government, and the majority all go to great lengths to stress that the government's "apparent" rationale is not the same as its "actual" reasons for the strikes, which, it is alleged, the government has not yet presented. This seems to be nothing but a convenient fiction, in which everyone can pretend that we still are at the *prima facie* stage of the *Batson* inquiry simply by agreeing that the reasons "apparent" in the record are not the same as whatever actual reasons the government has yet to offer. *Accord Stewart*, 65 F.3d at 925 ("No party challenging the opposing party's use of a peremptory strike . . . is entitled to an explanation for that strike, much less to have it disallowed, unless and until a *prima facie* showing of racial discrimination is made."); *cf. Mahaffey*, 162 F.3d at 483-84.

Though it claims to be doing otherwise, the majority

weighs the very factors that it concedes to be appropriate in the next stage of review and finds the government's "apparent" reasons insufficient to undermine the inference drawn from the disproportionate strikes alone. And in weighing the government's "apparent" reasons, and giving them no credit whatsoever, the majority blurs the *Batson* framework by shifting the burden of persuasion to the government at the *prima facie* stage.

The majority does this by scouring the government's "apparent" race-neutral justifications for purported contradictions—namely, that some Caucasian jurors shared certain traits with dismissed minority venirepersons—and concludes that the record fails to provide evidence to negate the majority's inference of discrimination. *Cf. Alverio*, 253 F.3d at 941 ("[W]here a party gives multiple reasons for striking a juror, it is not enough for the other side to assert that the empaneled juror shares one attribute with the struck juror.") (citation omitted). But this conclusion seems to me nothing more than a thinly disguised finding that the government's reasons, whether one calls them "apparent" or "actual," are not to be credited because the supposed contradictions render them suspect.

The majority thus holds the government to a higher standard, at the *prima facie* stage, than the ordinarily low threshold the government must meet in the second stage of the *Batson* framework. *See Purkett*, 514 U.S. at 769 (noting that a "'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection[,]" and finding acceptable the prosecutor's explanations that he struck jurors for "long, unkempt hair, a mustache, and a beard"); *see also United States v. Evans*, 192 F.3d 698, 701 (7th Cir. 1999) ("Any neutral reason, no matter how implausible or fantastic, even if it is silly or superstitious, is sufficient to rebut a *prima facie* case of discrimination.") (citation and internal quotes omitted). Certainly, the required showing is minimal compared to the burden the

majority has effectively imposed on the government here at the *prima facie* stage, in which facially race-neutral "apparent" reasons are found wanting by the majority. This amounts to a finding that the government has offered pretextual reasons for its strikes—a determination appropriate only in the final stage of the *Batson* inquiry, not at the *prima facie* stage. *Cf. Purkett*, 514 U.S. at 768 ("It is not until the *third* step that the persuasiveness of the justification becomes relevant[.]")

Nevertheless, the government's "apparent" reasons for its peremptory strikes—including, for example, level of education, employment, or errors on jury questionnaires—are not facially discriminatory, outlandish, or otherwise improper. *See, e.g.*, *Alanis*, 265 F.3d at 584 (education); *Alverio*, 253 F.3d at 941 (employment); *United States v. Smith*, 324 F.3d 922, 927 (7th Cir. 2003) (mistakes on juror questionnaire). In fact, given the nature of the case against Stephens, the "apparent" reasons for the government's strikes are perfectly consistent with what we may assume was the government's prosecution strategy. As the government pointed out, this case is a white-collar fraud case. Much of the evidence against Stephens involved accounting and computer functions, so it is not surprising that the government would seek jurors apparently better suited to understand the nature of the case and the evidence.

Despite the majority's assumption from supposed inconsistencies in the record that the government was of a mind to discriminate, the government's actions in exercising its strikes are perfectly consistent with a legitimate, race-neutral strategy given the nature of the wire-fraud case against Stephens.

Indeed, as explained earlier, the government did not strike Juror #13, an African-American woman, from the venire. The government's reasons for wanting Juror #13 on the jury are readily apparent from the record—on her

juror questionnaire and during voir dire, Juror #13 indicated that she had experience working in the business world and holds an MBA from the University of Chicago. In other words, Juror #13 was an ideal juror from the government's standpoint, because her education and experience would be helpful in understanding the evidence presented at trial. Likewise, the government did not strike Juror #4, a Hispanic woman, who has an associate's degree in accounting. As with Juror #13, the government likely viewed Juror #4 as being well suited to understand the evidence against Stephens. The prosecutors therefore did not strike either of these minority venirepersons, but did strike other minorities who did not have comparable traits.

Stephens, in contrast, apparently struck jurors according to an opposite strategy. As noted earlier, it was Stephens, not the government, who struck Juror #13, again for reasons not difficult to divine. Juror #13's qualifications—particularly her education and white-collar business experience—made her more likely to understand the technical aspects of the prosecution's case, possibly pro-business, and perhaps less sympathetic to Stephens.

The majority sidesteps all of these relevant factors in its zeal to find inconsistencies in the government's "apparent" facts. Worse, the majority places no stock in any of these other "apparent" facts, so I wonder what "actual" reasons the government on remand could possibly offer in an attempt to undermine the apparently foregone conclusion that it has engaged in discrimination because the numbers are so far out of kilter. At any rate, a *Batson* hearing seems largely superfluous at this point, given the majority's conclusions that the government's "apparent" reasons for its strikes are inconsistent (and therefore, presumably, pretextual).

Finally, I must reiterate the government's concern that parties making *Batson* challenges should offer some

meaningful quantum of proof, not merely statistics, in order to satisfy their *prima facie* burden. *Batson* and its progeny make clear that courts are not simply to skip over the *prima facie* stage. *Aki-Khuam*, 339 F.3d at 527 (finding that the trial court improperly "replaced the first step of the *Batson* analysis with [its] presumption of purposeful discrimination, thereby saddling [the party making the strikes] with the burden of overcoming that presumption"). As in the present case, local demographics and chance largely determine the racial makeup of any given venire, and peremptory strikes may as a consequence disproportionately affect certain racial groups simply as a matter of numbers (particularly where the numbers are small, as in this case). But courts must look beyond statistics and require litigants to carry their respective burdens under the *Batson* framework, or we risk paying lip service to clearly established caselaw and arguably set the stage for a rule that in practice (just as Stephens would have it) calls for a *Batson* hearing every time a party strikes a minority member from the venire. *See Cooke*, 110 F.3d at 1301 ("[The defendant] must point to facts and circumstances raising an inference that the potential juror was excluded because of race. Otherwise, every peremptory challenge used to exclude any cognizable minority from a petit jury would require a *Batson*-type hearing.") (citation and internal revisions omitted).

Although my colleagues reprove me for suggesting a "parade of horribles," I believe the majority's *Batson* holding represents yet another step toward elimination of the peremptory challenge, which is undeniably an important and integral part of jury selection in our adversarial system. *See Batson*, 476 U.S. at 112 (Burger, C.J., dissenting) (observing that the peremptory challenge is "a procedure which has been part of the common law for many centuries and part of our jury system for nearly 200 years."); *Burnham*, 6 F.3d at 481 ("Tradition engraves the process of

peremptory challenges into our system[.]"). At the least, a jury selection regime that places undue emphasis on racial proportions places form over substance and creates improper incentives. For example, parties may opt to use all of their peremptory strikes in order to mitigate any possible disproportionate impact on minorities (or anyone else protected by *Batson* and its progeny). Worse, parties could engineer their peremptory challenges to mirror the racial proportions of the venire, thus discriminating on the basis of race. And courts that fail *sua sponte* to respond to statistically disproportionate strikes risk remand, even if (as in this case) ample evidence supports the jury's verdict and there is no indication that race was at issue in the trial. Before long, peremptory challenges will simply merge with challenges for cause if litigants must explain every strike of a protected venireperson, thus eliminating altogether a practice designed to assist litigants in the imprecise but necessary science of jury selection. *Cf. Pruitt v. McAdory*, 337 F.3d 921, 930-31 (7th Cir. 2003) ("Picking jurors is a complex and multifaceted process. Individual factors or characteristics often do not provide the 'silver bullet' that will mean acceptance or rejection of any potential juror. Rather, it is a combination of factors that will determine whether a party believes a juror will be favorable to their side[.]").

In conclusion, for the reasons set forth above, I respectfully dissent as to Part II of the majority opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—8-29-05